# COMPOSITE
# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CIVIL DIVISION
CASE NO.:      **13 - 0 2 8 6 6**

VIRTUOX, INC., a Florida corporation,

        Plaintiff,

v.

VIRGINIA KRAPF,

        Defendant.

_____/

**OBTAIN DESCRIPTION**

# 04

Military Status Based Upon Inquiry Of Party Served, Defendant _____ is, ✓ is NOT, In The Military Service Of The U.S.

## <u>SUMMONS</u>

THE STATE OF FLORIDA:

To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this Summons and a copy of the Complaint or Petition in this action on Defendant:

        VIRGINIA KRAPF
        8978 Bainbridge Place
        Stockton, CA 95209

    Each Defendant is required to serve written defenses to the Complaint or Petition on Jerome Silverberg, Esquire, plaintiff's attorney, whose address is: **Lewis Brisbois Bisgaard & Smith, LLP, 200 S.W. 1st Ave., Suite 910, Fort Lauderdale, Florida 33301, ftlemaildesig@lbbslaw.com** within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED on January 30, 2013.   **FEB 01 2013**

HOWARD C. FORMAN

as Clerk of The Court

Julie Lynn Green
Reg #428
Date: 02-12-13
Time: 09:55

BY: _____

CORINNE WILSON

As Deputy Clerk

**A TRUE COPY**
Circuit Civil



RECEIVED
FEB 01 2013
By

4843-8422-7346.1

## IMPORTANT

    A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

    If you choose to file a written response yourself, at the same time you file your written response to the court you may also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

## IMPORTANTE

    Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica.

    Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont été entreprises contre vous.  Vous avez 20 jours consécutifs à partir de la date de l'assignation de cette citation pour déposer une réponse écrite à la plainte ci-jointe auprès de ce tribunal.  Un simple coup de téléphone est insuffisant pour vous protéger.  Vous êtes obligés de déposer votre réponse écrite, avec mention du numéro de dossier ci-dessus et du nom des parties nommées ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne déposez pas votre réponse écrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent être saisis par la suite, sans aucun préavis ultérieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requérir les services immédiats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez téléphoner à un service de référence d'avocats ou à un bureau d'assistance juridique (figurant à l'annuaire de téléphones).

Si vous choisissez de déposer vous-même une réponse écrite, il vous faudra également, en même temps que cette formalité, faire parvenir ou expédier une copie de votre réponse écrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou à son avocat) nommé ci-dessous.

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

VirtuOx, Inc., a Florida corporation,                    Case No.

     Plaintiff,

                        **13 - 0 2 8 6 6**

vs.

Virginia Krapf

     Defendants.

_____/

**PLAINTIFF'S ORIGINAL COMPLAINT**

    Plaintiff, VirtuOx, Inc. (herein "VirtuOx" or "Plaintiff") files its Original Complaint against

Defendants Virginia Krapf (herein "Krapf or "Defendant"), and would respectfully show the Court

as follows:

**I. PARTIES**

    1.    VirtuOx, Inc. is a Florida corporation authorized to do business in the State of

Florida.

    2.    Defendant Virginia Krapf is an individual resident of the State of California.

**II. VENUE & JURISDICTION**

    3.    Venue is proper in Broward County, Florida because the terms of the agreements

giving rise to the claims herein specifically state that Florida law is to be applied to any disputes and

that any legal proceedings between the parties shall be brought in Broward County, Florida.

    4.    This Court has jurisdiction over the lawsuit in that the matter in controversy exceeds

$15,000, exclusive of interest and costs.

A TRUE COPY

FEB 01 2013

HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

## III. GENERAL ALLEGATIONS

**Medicare Pulse Oximetry Testing**

5.      The Medicare Program ("Medicare") requires healthcare providers to abide by numerous rules and regulations in order to bill Medicare for patient services.  Depending on the service that is billed to Medicare, the provider, and individuals working on behalf of the provider, must have certain certifications, licenses, and/or credentials.

6.      Medicare Part B covers outpatient services, such as diagnostic tests.  Generally, a non-physician provider that bills for outpatient diagnostic services must be licensed and accredited as an Independent Diagnostic Testing Facility ("IDTF").

7.      In order to bill Medicare for certain respiratory diagnostic tests, an IDTF must employ one or more individuals with appropriate respiratory certifications and credentials. If the IDTF bills for these tests without having a person on staff with the appropriate respiratory certifications and credentials, the claims will be denied by Medicare.  Even more, Medicare may recoup overpayments where the IDTF improperly billed for certain diagnostic tests without employing someone with appropriate certifications and credentials.

**VirtuOx's Business**

8.      VirtuOx is a privately held IDTF that provides diagnostic tools and services.  The company provides at-home diagnostic testing to assist in the diagnosis and qualification of treatment options for sleep disorder, breathing, and respiratory diseases, along with web-based management applications that communicate with physicians, medical equipment providers, and patients.

9.      Medicare is the majority payer for VirtuOx's diagnostic testing services.

10.     VirtuOx's business is dependent on its relationships with physicians, medical equipment providers and patients. The business is highly competitive and further relies on its ability to be paid by Medicare to maintain a competitive advantage over others in the industry.

11.     VirtuOx invests considerable amounts of time, money and other resources in developing its products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of the patients.

**Defendants' Actions Giving Rise to this Lawsuit**

12.     Defendant owned and operated a company by the name of Oxi-techs. At all times relevant to this lawsuit, Oxi-techs was an IDTF that performed similar services in California to those offered by VirtuOx, including billing Medicare for certain respiratory diagnostic tests.

13.     In an effort to expand its business, on or about January 27, 2010, VirtuOx purchased the stock of Oxi-Techs.

14.     Defendant had full knowledge that the value VirtuOx placed on Oxi-techs was based on representations by Defendant that Oxi-techs was in full compliance with all federal and state laws and regulations to perform and bill for the testing that Oxi-techs performed.

15.     Nearly 100% of Oxi-techs' revenue came from testing services for which Medicare was the payer.

16.     The Agreement for the Exchange of Shares specifically stated:

> "4.10 Compliance with Law and Other Instruments. The business and operation of the Corporation have been or are being conducted in accordance with all applicable laws, rules and regulations. . . The Corporation is not in violation of its Article of Incorporation, as amended, its Bylaws, or of any indebtedness, mortgage, contract lease or other agreement or commitment."

(A copy of the Agreement for the Exchange of Shares is attached as Plaintiff's Exhibit "1").

17.    Furthermore, the Agreement for the Exchange of Shares states:

> "4.27 Material Facts. Seller has no knowledge of any materially adverse matter or thing relative to the condition, financial or otherwise, of the Corporation's business, or its prospects, not disclosed in this Agreement."

18.    To ensure that Defendant acted in full compliance with her obligations under the Exchange Agreement, Defendant agreed to indemnify VirtuOx for any damages resulting from Defendant's failure to operate Oxi-tech in full compliance with all and regulations:

> "8. The Seller hereby agrees to indemnify and hold harmless the Purchaser against and in respect to all damages (as hereinafter defined).  Damages as used herein, shall include any claim, action, demand, loss, cost, expense, liability (joint or several), penalty and other damage, including, without limitation, counsel fees and other costs and imposition thereof, or in enforcing this indemnity, resulting to the Purchaser from any materially inaccurate representation made by or on behalf of Seller in or pursuant to this Agreement, breach of any warranties made by or on behalf of Seller in or pursuant to this Agreement, or breach or default in the performance by the Seller of any of the obligations to be performed by it hereunder . . ."

19.    As a further matter, Defendant executed and became a party to the Amended and Restated Stockholders Agreement of VirtuOx, Inc. (the "Stockholders' Agreement"). (A copy of the Stockholder's Agreement is attached as Plaintiff's Exhibit "2").

20.    The Stockholders' Agreement provided that no stockholder was to compete with VirtuOx:

"14. Covenant Not to Compete. Each Stockholder agrees that he shall not, directly or indirectly, within the United States, enter into or engage in general, direct or indirect competition with [VirtuOx] in any manner with any business of the type and character carried on by [VirtuOx]'s business, either as an individual on his own or as a partner or joint venture, or as an employee or agent, or as a lender or guarantor, for any person, firm or corporation, or as an officer, director, stockholder or otherwise during the term of this Agreement; and for a period of two (2) years after the transfer of his stock. . ."

21.     The Stockholders' Agreement further provided:

"It is the specific intent of the parties that a Stockholder shall not utilize any trade secrets, customer lists, nor directly solicit any customers of the business of the Corporation or prospective customers call upon by its business for the same or similar business engaged or contemplated to be engaged in by the Corporation. . ."

## COUNT I
## DECLARATORY RELIEF

22.     VirtuOx re-alleges and adopts paragraphs 1-21, supra, as though fully set forth herein.

23.     VirtuOx seeks to maintain the sanctity of its contractual documents.

24.     Accordingly, VirtuOx brings this cause of action pursuant to the Florida's Declaratory Judgment Act, 86.011, et seq., Florida Statutes, and specifically seeks a judicial determination that the Agreement for the Exchange of Shares (the "Exchange Agreement") is a valid and enforceable contract.  VirtuOx is an interested party under the Exchange Agreement, whose rights, status or other legal relations are affected by that contract.

25.     VirtuOx further seeks a declaration that, pursuant to the Exchange Agreement, Defendant knew or should have known, understand and further disclosed to VirtuOx any limitations to the licensure and/or certification that Defendant obtained on behalf of Oxi-techs which could

affect Oxi-techs' business operations and ability to bill Medicare for diagnostic testing services it provided at or immediately before the date the Exchange Agreement was executed.

26.     VirtuOx further seeks a declaration that the indemnity provision of the Exchange Agreement requires Defendant to repay approximately $100,000.00 in overpayment fees recouped by Medicare against VirtuOx due to Defendant's failure to have appropriate certifications and/or credentials required for Oxi-techs to bill Medicare for certain respiratory diagnostic tests.

27.     VirtuOx seeks a judicial determination and a declaration of the rights and obligations of the parties with respect to an actual controversy arising under the Exchange Agreement.

28.     There is an actual, bona fide dispute as to the construction of the Exchange Agreement. This bona fide dispute requires a judicial declaration as to the respective rights and duties of the parties under the Exchange Agreement.

WHEREFORE, the Plaintiff, VirtuOx, respectfully prays for a judicial declaration that the Agreement for the Exchange of Shares (the "Exchange Agreement") is a valid and enforceable contract; that Defendant knew and should have disclosed any limitations to the certification, licenses, and/or credentials that Defendant obtained on behalf of Oxi-techs to bill Medicare for certain respiratory diagnostic tests; and that VirtuOx is entitled to approximately $100,000.00 in indemnity for overpayment fees recouped by Medicare against VirtuOx pursuant to the Exchange Agreement; and that Plaintiff is entitled to attorney's fees and costs.

## COUNT II
## BREACH OF CONTRACT

29.     VirtuOx re-alleges and adopts paragraphs 1-21, supra, as though fully set forth herein.

MHDocs 4220160_2 12567.5

30.     The Exchange Agreement is a valid, enforceable contract.  VirtuOx is the proper party to sue Defendant for breach of contract.  VirtuOx fully performed its contractual obligations under the Exchange Agreement.

31.     Defendant, however, materially breached the Exchange Agreement by, among other things, not ensuring that Oxi-techs was operating in accordance with all applicable laws, rules and regulations when billing Medicare for certain respiratory diagnostic tests.

32.     Defendant further is in breach of the Stockholders Agreement to the extent that she is operating a business in direct competition with VirtuOx and is using protected confidential information that Defendant contractually agreed not to use.

33.     As a direct and proximate result of Defendant's material breach, VirtuOx incurred actual damages in excess of the minimum jurisdictional limits of this Court.

WHEREFORE, the Plaintiff, VirtuOx, Inc., respectfully requests that upon trial of this matter Plaintiff have judgment against Defendant 1 for Plaintiff's damages in excess of the jurisdictional limits of this court, plus prejudgment interest, costs of court, reasonable and necessary attorneys and expert witness fees, post-judgment interest, and such other and further relief to which Plaintiffs may show themselves justly entitled.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS

34.     VirtuOx re-alleges and adopts paragraphs 1-21, supra, as though fully set forth herein.

35.     As a nationally recognized IDTF, VirtuOx's business model relies upon its independent development of 'customer lists' – established through its relationships with medical providers – to sustain its profitable business model.

36.    VirtuOx's customer lists and information about its relationships with various medical providers constitute a 'trade secret' which are highly valuable and not readily accessible to members of the public or to any of VirtuOx's competitors.

37.    VirtuOx retains its customer lists in a computerized database and is only accessible by designated employees of VirtuOx.

38.    VirtuOx utilized a unique billing process and employed unique methods within its business, which was also not disclosed to third parties outside of VirtuOx.

39.    VirtuOx had taken reasonable measures to protect the security, integrity and confidentiality of its customer lists and unique billing procedures, including, but not limited to, securing the information in a password-protected database and limiting access of the database and information to designated employees.

40.    Defendant was intimately acquainted with VirtuOx's business operations and knew that VirtuOx's customer lists and billing practices and procedures were vital to VirtuOx's business operations and continued profitability.

41.    In an effort to effectively resurrect Krapf's old company, Oxi-techs (through WCD), and in breach of the Stockholders' Agreement's Covenant Not to Compete, Defendant willfully and maliciously misappropriated VirtuOx's customer lists and billing procedures in order to directly compete with VirtuOx.

42.    As a direct and proximate result of Defendant's willful and malicious misappropriation of VirtuOx's customer lists, VirtuOx has suffered actual damages which will be proven at trial.

43.    As a direct and proximate result of Defendant's willful and malicious misappropriation of VirtuOx's customer lists, Defendant and her company, West Coast Diagnostics

MHDocs 4220160_2 12567.5

(herein "WCD"), have been unjustly enriched by the aforementioned misappropriation of VirtuOx's trade secrets.

44.     Defendant's willful and malicious misappropriation of VirtuOx's trade secrets entitles VirtuOx to seek exemplary damages pursuant to Fla. Stat. §688.04.

WHEREFORE, the Plaintiff, VirtuOx, Inc., respectfully requests that upon trial of this matter Plaintiff have judgment against Defendant for Plaintiff's damages in excess of the jurisdictional limits of this court, including, but not limited to exemplary damages plus prejudgment interest, costs of court, reasonable and necessary attorneys and expert witness fees, post-judgment interest, and such other and further relief to which Plaintiff may show itself justly entitled.

## COUNT IV
## UNJUST ENRICHMENT

45.     VirtuOx re-alleges and adopts paragraphs 1-21, supra, as though fully set forth herein.

46.     This is an action for unjust enrichment, and an alternative claim to the breach of contract claim seeking the same damages, against Defendant Krapf relating to misappropriation and exploitation of VirtuOx's customer lists.

47.     Defendant is in possession of customer lists misappropriated from VirtuOx.

48.     Defendants has used VirtuOx's customer lists in order to benefit Defendant Krapf's competing business, WCD.

49.     Neither Defendants nor Oxi-techs have offered any monies or any other form of royalties or compensation to VirtuOx for the monies WCD has realized from the misappropriation of VirtuOx's customer lists.

50.     As a result, Defendant and her company, WCD, have been unjustly enriched at VirtuOx's expense, and accordingly, Defendant should tender payment to VirtuOx.

WHEREFORE, the Plaintiff, VirtuOx, Inc., respectfully requests that upon trial of this matter Plaintiff have judgment against Defendant for Plaintiff's damages in excess of the jurisdictional limits of this court, including, but not limited to prejudgment interest, costs of court, reasonable and necessary attorneys and expert witness fees, post-judgment interest, and such other and further relief to which Plaintiff may show itself justly entitled.

## V. **DEMAND FOR JURY TRIAL**

VirtuOx demands a trial by jury on this action.

FILED this 31st day of January, 2013.

Respectfully submitted,

LEWIS BRISBROIS BISGAARD & SMITH, LLP.
200 S.W. 1st Avenue, Suite 910
Fort Lauderdale, Florida 33301
Tel. (954) 728-1280
Fax. (954) 728-1282

By:_____
MARK A. KIRSCH
Fla. Bar No. 110094
kirsch@lbbslaw.com
JEROME R. SILVERBERG
Fla. Bar No. 355127
jsilverberg@lbbslaw.com

ATTORNEYS FOR PLAINTIFF VIRTUOX, INC.

MHDocs 4220160_2 12567.5

## AGREEMENT FOR EXCHANGE OF SHARES

This Agreement is entered into effective as of the 1st day of February, 2010, between Virtuox, Inc., a Florida corporation, hereinafter referred to as "Purchaser," and Virginia Krapf, hereinafter referred to as "Seller."

### RECITALS

The Seller is the owner of all of the issued and outstanding shares of capital stock of Oxi-Techs, Inc., a California corporation, hereinafter referred to as the "Corporation."

The Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, all of the issued and outstanding shares of capital Stock of the Corporation, hereinafter referred to as the "Stock," upon the terms and conditions contained herein.

Therefore, in consideration of the mutual promises and conditions herein contained, the parties jointly and severally agree as follows:

### AGREEMENT

1.    Exchange of Stock. Subject to the terms and conditions of this Agreement, the Seller agrees to sell, transfer and assign to the Purchaser, and the Purchaser agrees to purchase, at the closing, as hereinafter defined, _____ (____) shares of common stock, par value _____ Dollars ($_____) per share (the "Stock") of the Corporation, such shares in the aggregate constituting all of the issued and outstanding capital shares of the Corporation in exchange for 47 shares (4.5%) of Virtuox, Inc. At the closing, the Seller shall deliver to the Purchaser a certificate or certificates evidencing the Stock in form ready for transfer and duly endorsed to the Purchaser. At the closing, and from time to time thereafter, the Seller shall execute and deliver such other documents and instruments and take such other actions as the Purchaser may reasonably request in order more fully to vest in the Purchaser and perfect his title to:

   1.1    All right, title and interest in and to the Stock; and

   1.2    Any and all other right, title, interest, claim or demand of any kind which the Seller may have in, to or upon any of the properties, assets or business of the Corporation.

2.    Purchase Price. The total price to be paid by the Purchaser to the Seller shall be forty-seven (47) shares of common stock of Purchaser representing 4.5% of the outstanding common stock of Purchaser.

3.    Closing Date. The closing date for the transaction contemplated under this Agreement shall take place upon the exchange of Seller's shares in the Corporation for the Purchase Price to be effective as of February 1, 2010.

4.    Representations and Warranties by Seller. The Seller represents and warrants to the Purchaser as follows:



4.1    Present Distribution of Stock Ownership.  The total number of authorized and issued shares of the Corporation are owned as follows:

| Stockholder | No. of |
| Shares | Stock Certificate No. |

Virginia Krapf  100

Total Number of Issued Shares of the Capital Stock of the Corporation:

The Corporation is authorized by its Articles of Incorporation, as amended, to issue _____ (___) shares of common stock, par value _____ Dollars ($_____) per share, _____ (___) of which are duly and validly issued and outstanding, fully paid and non-assessable.  The Corporation has no authority to issue any other capital stock or other securities.  All state documentary or transfer stamps required by law to be purchased and affixed to the stock book or any certificate evidencing Stock of the Corporation have been so purchased and affixed.  The unissued shares of the Corporation have never been issued.

4.2    Present Officers and Directors.  The present officers and directors of the Corporation are as follows:

| Name |
| Position |

Virginia Krapf         President

4.3    Title to the Stock.  The Seller has good, absolute and marketable title to all of the Stock of the Corporation, free and clear of all liens, claims, encumbrances and restrictions of every kind.  The Seller has the complete and unrestricted right, power and authority to sell, transfer and assign the Stock pursuant to this Agreement.  The delivery of the Stock to the Purchaser as herein contemplated will vest in the Purchaser good, absolute and marketable title to all of the Stock, free and clear of all liens, encumbrances and restrictions of every kind.

4.4    Organization.  The Corporation is a duly organized and validly existing California corporation in good standing with all requisite corporate power and authority to carry on its business as presently conducted, and is entitled to own its properties in the places where such properties are located.  The sole business of the Corporation concerns the operation of a Laboratory known as "Oxi-Techs Inc," with its principal business office located at Stockton, California.  The Corporation is duly qualified as a foreign corporation in good standing in each jurisdiction wherein the nature of its activities or its properties owned or leased makes such qualification necessary.  The Corporation has no subsidiaries and has no direct or indirect equity interest in any other firm, corporation or business enterprise.

4.5    Options.  There are no outstanding options, contracts, commitments, warranties, agreements or other rights of any character affecting or relating in any manner to

2

the Stock or to the issuance of the Corporation's capital shares or other securities, or entitling anyone to acquire the Stock or the Corporation's capital shares or other securities.

4.6     Financial Statements.  Attached hereto as Exhibit "A" and made a part hereof is a balance sheet of the Corporation as of December 31, 2009, and the related statement of income and retained earnings for the year ended December 31, 2009, statements:

4.6.1  Are in accordance with the books and records of the Corporation;

4.6.2  Fairly present the financial condition of the Corporation at such dates and the results of its operations for the periods therein specified;

4.6.3  Were prepared in accordance with generally-accepted accounting principles applied upon a basis consistent with prior accounting periods; and

Specifically, but not by way of limitation, the balance sheet discloses all of the debts, liabilities and obligations of any nature (whether absolute, accrued, contingent or otherwise, and whether due or to become due) of the Corporation at the balance sheet date (except such debts, liabilities and obligations as are not required to be reflected therein in accordance with generally-accepted accounting principles) and includes appropriate reserves for all taxes and other liabilities accrued or due at such dates but not yet payable.

The parties acknowledge that the financial records of the Corporation may not be complete for the period of operation of the Corporation through the date of closing. Seller hereby agrees, at its expense, to cause all financial records of the Corporation to be prepared through the date of closing in the event same are not complete as of the date of closing.  It is the intent of the parties that all financial records of the Corporation shall be delivered to Purchaser.

4.7     Present Status.  Since the balance sheet date, the Corporation has not:

4.7.1  Incurred any obligations or liabilities, absolute, accrued, contingent or otherwise, except current liabilities in the ordinary course of business; discharged or satisfied any liens or encumbrances, or paid any obligations or liabilities, except current balance sheet liabilities and current liabilities incurred since the balance sheet date; in each case, in the ordinary course of business;

4.7.2  Declared or made any shareholder payment or distribution or purchased or redeemed any of its securities or agreed to do so;

4.7.3  Mortgaged, pledged or subjected to lien, encumbrance or charge of any of its assets; canceled any debt or claim;

4.7.4  Sold or transferred any assets, except sales from inventory in the ordinary course of business;

4.7.5  Suffered any damage, destruction or loss (whether or not covered

3

by insurance) materially affecting its properties, business or prospects;

   4.7.6 Waived or modified any rights of substantial value; entered into any transaction other than in the ordinary course of business;

   4.7.7 Experienced any event or condition (financial or otherwise) which does have, or reasonably might have, a material adverse affect on its assets, condition or business prospects.

  4.8 Tax Returns and Audits.  The Corporation has duly filed all federal, state and local tax returns required to be filed by it and has paid all federal, state and local taxes required to be paid with respect to the periods covered by such returns.  The Corporation has not been nor is it delinquent in the payment of any tax, assessment or governmental charge. The Corporation has not had any tax deficiencies proposed or assessed against it and has not executed any waiver of the statute of limitations on the assessment or collection of any tax. The Corporation's Federal Tax Returns have never been audited by the Internal Revenue Service.  The Corporation's State Tax Returns have never been audited.

  In the event any returns or reports are required to be prepared and filed for the period of operations of the Corporation prior to the date of closing, Seller agrees to cause the same to be timely prepared and filed, at its expense, and in addition, satisfy all amounts falling due with respect thereto.

  In the event that after the closing date a deficiency is determined in the amount of any federal, state or local tax payable by the Corporation, which deficiency relates to periods ending prior to the closing date, then, in that event, the Seller shall be fully responsible for the payment of said deficiency.

  4.9 Litigation.  There are no legal actions, suits, arbitrations or other legal, administrative or other governmental proceedings pending or threatened against the Corporation, its properties, assets or business; and neither the Seller nor the Corporation is aware of any facts which, to the knowledge of either, might result in any such action, suit, arbitration or other proceeding.

  4.10 Compliance with Law and Other Instruments.  The business and operation of the Corporation have been or are being conducted in accordance with all applicable laws, rules and regulations of all authorities, except those which do not (either individually or in the aggregate) materially or adversely affect the Corporation or its properties, assets, businesses or prospects.  Performance of this Agreement will not result in any breach of, or constitute a default under, or result in the imposition of any lien or encumbrance upon any property of the Corporation under any arrangement, agreement or other instrument to which the Corporation or the Seller is a party or by which either is bound or affected, and will not violate the Articles of Incorporation, as amended, or the Bylaws of the Corporation.  The Corporation is not in violation of its Articles of Incorporation, as amended, its Bylaws, or of any indebtedness, mortgage, contract lease or other agreement or commitment.

  4.11 List of Personal Property.  Attached hereto as Exhibit "B" is a list of all equipment, furniture, fixtures, vehicles and other tangible personal property of the Corporation,

4

which shall remain the property of the Corporation through the closing.

4.12   Lease.   The Corporation is the holder of a lease for its business premises, a true and complete copy of which is attached hereto as Exhibit "C" (the "Lease"). The Lease is a valid lease and is current and in good standing.  No defaults exist or will exist at the closing with respect to the Lease.  The Lease has not been modified or amended, except as set forth on the attached Exhibit "C."

4.13   Title to Property and Assets.   The Corporation has good, absolute and marketable title to all its properties and assets, subject to no mortgage, pledge, lien, charge, security interest, encumbrance or restriction, except those which are disclosed on the balance sheet as securing specified liabilities or are disclosed in the List of Personal Property attached hereto as Exhibit "B" or the Schedule of Assets attached hereto as Exhibit "D."  All the equipment of the Corporation is in good condition and repair, reasonable wear and tear accepted, and shall be so at the closing of this transaction.  The Corporation has not been threatened with any action or proceeding under any building or zoning ordinance, regulation or law.

4.14   Schedule of Assets.   Within seven (7) days after the execution of this Agreement, the Seller will deliver to the Purchaser a separate Schedule of Assets (to be attached hereto as Exhibit "D") specifically referring to this paragraph containing:

4.14.1 Copies of deeds to any and all real properties owned and held by the Corporation;

4.14.2 A true and complete legal description of all real properties in which the Corporation has a leasehold interest, together with a copy of each indenture, lease, sublease or other instrument under which the Corporation claims or holds such leasehold interest; the Corporation has good and valid leasehold interests in such properties, and all such instruments are in effect, not in default and enforceable according to their respective terms;

4.14.3 A true and complete list of all patents, patent applications, patent licenses, trademarks, trademark registrations and applications therefor, trade names, copyrights, and copyright registrations and applications therefor owned by the Corporation;

4.14.4 A true and complete list of all accounts receivable of the Corporation at _____ together with information as to the aging of each such account; and

4.14.5 A true and complete list of all insurance policies of the Corporation.

4.15   Contracts and Obligations.   Except as set forth on Exhibit "E" attached hereto, the Corporation is not a party to, or otherwise bound by, any:

4.15.1 Written or oral contract not made in the ordinary course of

5

business;

4.15.2 Employment or consultant contract not terminable at will without cost or other liability;

4.15.3 Labor union contract, bonus, pension, profit sharing, retirement, share purchase, stock option, hospitalization, group insurance or similar employee benefit plan;

4.15.4 Real or personal property lease, as lessor or lessee;

4.15.5 Advertising or public relations contract;

4.15.6 Purchase, supply or service contract in excess of One Thousand Dollars ($1000) each, or which is not terminable without cost or expense on less than thirty (30) days notice;

4.15.7 Deed of trust, mortgage, conditional sales contract, security agreement, pledge agreement, trust receipt or any other agreement or arrangement whereby any of the assets or properties of the Corporation are subject to a lien, encumbrance, charge or other restriction;

4.15.8 License agreement, whether as licensee or licensor, contract or agreement involving any expenditure by it of more than One Thousand Dollars ($1000);

4.15.9 Contract or agreement which is not terminable by it on more than thirty (30) days notice;

To the best of the Seller's knowledge and belief, the Corporation has in all respects performed all obligations required to be performed to date and is not in material default in any respect under any of the contracts, agreements, leases, documents or other commitments to which it is a party or otherwise bound or affected. All parties having contracts with the Corporation are in material compliance therewith and are not in material default thereunder.

4.16    Corporate Name and Telephone.  The assets of the Corporation shall include, at the closing, the name "Oxi-Techs," and all variations thereof.

4.17    Employees.  Attached hereto as Exhibit "E" and made a part hereof by reference is a list of all employees of the Corporation, the salaries of each, the respective duties of each, the accrued vacation and sick leave of each, if any, and all salary, commission or other compensation due such employees.  Such list also includes the names of all officers and Directors of the Corporation who receive compensation for their services performed to the Corporation.  Unless otherwise disclosed, the Seller has no information or facts indicating that any employee or representative (excluding the Seller and the officers and directors of the Corporation) listed in said Schedule intends to terminate such relationship with the Corporation as a result of this transaction.  There is no bonus due to any officer, director or employee other than as set forth in the aforementioned Exhibit.  No officers, directors, employees or stockholders of the Corporation, and no members of their families have any direct, indirect or beneficial interest, or any option or other agreement to acquire any direct, indirect or beneficial

6

interest in any of the Corporation's principal suppliers, customers or creditors.

4.18   Compensation of Officers and Others.   Since the balance sheet date, there has not been any change in any compensation, commission, bonus or other remuneration payable to any officer, director, agent, employee or consultant of the Corporation.

4.19   Records.   The respective books of account and minute books of the Corporation are complete and correct and reflect all those transactions involving its business which properly should have been set forth in such books.

4.20   Absence of Certain Changes or Events.   Since the balance sheet date, there has not been any change in or any event or condition (financial or otherwise) affecting the properties, assets, liabilities, operations or prospects of the Corporation other than changes in the ordinary course of its business, none of which has (either when taken by itself or when taken in conjunction with all other such changes) been materially adverse to the assets or business of the Corporation.  No dividend or other distributions of the corporate assets to the stockholders have been declared or will be declared.

4.21   No Dealers or Finders.   Neither the Corporation nor the Purchaser will be obligated in any way for any commission, fee or other remuneration to any finder, dealer or the like employed or retained by the Seller in connection with this Agreement or its negotiation, execution or performance.

4.22   Accounts Receivable.   All of the accounts receivable of the Corporation which are reflected in the balance sheet and all its accounts receivable which have arisen since the balance sheet date (except such accounts receivable as have been collected since the balance sheet date) are valid and enforceable claims.  Such accounts receivable are fully collectible except to the extent of the amount of the reserve for bad debts set forth in the balance sheet, which reserve is, in all respects, adequate.
The Accounts Receivable prior to February 1, 2010 and the AR related to Oxi-techs NPF network for 90 days or until NPF cancellation of Relationship with Oxi-Techs is an excluded asset and is the sole property of Virginia Krapf.

4.23   Purchase Commitments and Outstanding Bids.   No purchase commitments of the Corporation are in excess of its normal, ordinary and usual requirements of its business, or were made at any price in excess of the then current market price, or contain terms and conditions more onerous than those usual and customary in the industry.

4.24   Insurance Policies.   There are in full force all policies of fire, liability and other forms of insurance for the assets and operations of the Corporation's business.  Such policies are in amounts and against such losses and risks as are generally maintained by comparable businesses.

4.25   Disclosure.   No representation or warranty by the Seller in this Agreement or in any writing furnished, or to be furnished pursuant hereto, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements herein or therein contained not misleading.

7

4.26    Obligations to Seller. At the closing, Purchaser or the Corporation will owe no obligations, liabilities or any amounts to Seller related to the acquisition contemplated herein other than as set forth in this Agreement.

4.27    Material Facts. Seller has no knowledge of any materially adverse matter or thing relative to the condition, financial or otherwise of the Corporation's business, or its prospects, not disclosed in this Agreement.

5.      Representations of Purchaser. The Purchaser represents to the Seller that:

5.1     It is authorized, by appropriate action of its shareholders, to enter into this Agreement and to consummate all the transactions contemplated by the Agreement including, without limitation, the issuance of the shares referred to in Paragraph 20 hereof; and

5.2     Seller will not be obligated for any commission fee or other remuneration to any finder, dealer or the like employed by Purchaser in connection with this Agreement or its negotiation, execution or performance.

6.      Liabilities of the Corporation.

6.1     Seller warrants and represents, that, except as specifically provided herein below, prior to the closing, all accounts payable and liabilities (whether due or to become due) and other encumbrances and obligations of the Corporation (or of Seller affecting the assets of the Corporation) which arose from actions occurring prior to the closing of this transaction shall be paid by or otherwise satisfied by Seller. At the closing, the Corporation shall have no liabilities or obligations of any nature, whether accrued, absolute, contingent or otherwise, or whether due or to become due, except as otherwise expressly permitted hereunder. Except for liabilities or obligations permitted hereunder, subsequent to the closing of this transaction, all accounts payable and other encumbrances and obligations of the Corporation (and of Seller affecting the assets of the Corporation) arising from actions occurring prior to the closing of this transaction which are asserted against the Corporation or Purchaser shall be paid by and otherwise satisfied by Seller promptly. In the event any liabilities or expenses are proratable, same shall be prorated, and Seller shall satisfy the amount attributable to the period prior to the closing. Seller shall hold Purchaser and the Corporation harmless from any and all such liabilities, claims, obligations, taxes, penalties and losses, and will fully indemnify Purchaser and the Corporation for payments on such items and damages suffered by Purchaser or the Corporation, including all costs and expenses in defending same, including reasonable attorneys' fees and court costs of appeal. At the closing, the sole and only liabilities of the Corporation shall be composed of:

6.1.1 Accrued federal and state corporate income taxes not yet becoming due and payable;

6.1.2 California sales taxes not yet becoming due and payable (however, a reserve for sales taxes relating to sales accruing prior to the closing shall be held in the Corporation's checking account or such amount shall be paid to Purchaser at the closing);

8

6.1.3 Future obligations falling due subsequent to the closing under the terms of the Lease for the business premises of the Corporation, a true and complete copy of which is attached hereto as Exhibit "C";

6.1.4 Future obligations falling due subsequent to the closing for utility service (telephone, electricity, water and gas, if applicable);

7. **Nature and Survival of Representations and Warranties.** All statements of fact contained in any memorandum, certificate, instrument or other document delivered by or on behalf of the Seller for information or reliance pursuant to this Agreement shall be deemed representations and warranties by the Seller under this Agreement. All representations and warranties shall survive the closing of this transaction.

8. **Indemnification.** The Seller hereby agrees to indemnify and hold harmless the Purchaser against and in respect of all damages (as hereinafter defined) herein, shall include any claim, action, demand, loss, cost, expense, liability (joint or several), penalty and other damage, including, without limitation, counsel fees and other costs and expenses reasonably incurred in investigating or in attempting to avoid same, or oppose the imposition thereof, or in enforcing this indemnity, resulting to the Purchaser from any materially inaccurate representation made by or on behalf of the Seller in or pursuant to this Agreement, breach of any of the warranties made by or on behalf of the Seller in or pursuant to this Agreement, or breach or default in the performance by the Seller of any of the obligations to be performed by it hereunder.

Purchaser agrees to give prompt written notice to Seller of the assertion of any claim or the arising of any matter, or the happening of any event to which this covenant of indemnification is applicable. Seller shall have twenty (20) days from the receipt of such notice within which to cure said matter. In the event such notice is given by reason of a claim asserted by any third party, Seller shall, within twenty (20) days after receipt of such notice, give Purchaser written notice of his decision whether to compromise, defend or settle such matter. In any event, Purchaser or Corporation shall not be liable for the cost of such defense, compromise or settlement, and Seller shall hold Purchaser and the Corporation free and harmless therefrom in all respects at all times.

In the event of any breach of Seller's covenants, warranties, agreements or representations contained in this Agreement, Purchaser may, at its option, without limiting any of its rights or remedies, withhold from any payment or payments due Seller, under any agreement (or instrument), an amount equal to all liabilities, damages, payments, losses, costs and expenses asserted or incurred, as evidenced by payments to, written demands or written claims from third parties. Any amount so withheld shall finally be adjusted between Purchaser and Seller upon final resolution of the matter giving rise to the withholding. Any amount so withheld shall, nevertheless, be deemed paid to Seller at the time of the withholding for purposes of any obligations or consideration payable to Seller.

9. **Assets of the Corporation.** Except as specifically provided for in this section, all assets owned by the Corporation shall continue to remain the property of the Corporation through the date of closing.

9

The parties hereto acknowledge that certain assets located at the premises of the business, more particularly described on Exhibit "F," attached hereto and made a part hereof, are the personal property of the Seller, or the property of others other than the Corporation and are not subject to the terms and conditions contained herein.

10.   Gender.   Wherever the context shall require, all words herein in the masculine gender shall be deemed to include the feminine and/or neuter gender; all singular words shall include the plural, and all plural shall include the singular.

11.   Attorneys' Fees.   In the event that any dispute arises pertaining to this Agreement, whether or not it involves litigation, the prevailing party shall be entitled to receive reasonable attorneys' fees and all costs incurred in connection with such enforcement, including court costs and costs of appeal.

12.   Severability.   The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

13.   Further Cooperation.   Each of the parties hereto agrees to execute whatever additional documentation or instruments as are necessary to carry out the intents and purposes of this Agreement.

14.   Waiver.   No indulgences extended by any party hereto or any other party shall be construed as a waiver of any breach on the part of such other party, nor shall any waiver of one breach be construed as a waiver of any rights or remedies with respect to any subsequent breach.

15.   Assistance.   Seller covenants and agrees to assist Purchaser in transferring from Seller to Purchaser the operation, management and administration of the business of the Corporation.

16.   Records of the Corporation.   For a period of three (3) years following the closing date, the books of account and records of the Corporation pertaining to all periods prior to the closing date shall be available for inspection by the Seller at the premises of the Corporation's business for use in connection with tax audits.

17.   Expenses.   Each of the parties shall bear all expenses incurred by it in connection with this Agreement and in the consummation of the transactions contemplated hereby and in preparation thereof.

18.   Brokerage Fees.   The parties each represent to the other that there were no real estate brokers or finders who are or were instrumental in the negotiation and/or consummation of this transaction. The parties agree that they will hold the other harmless and indemnify the other from and against any and all costs or liabilities, including reasonable attorneys' fees for brokerage or professional service fees claimed by any broker or finder employed or claiming to have been employed by the offending party.

10

19.   Compliance with Section 1445 of Internal Revenue Code.   Seller and Purchaser agree that in connection with the sale contemplated herein, the parties shall comply with Section 1445 of the Internal Revenue Code of 1986, as may be amended, and all regulations which are adopted thereunder from time to time.  Purchaser shall have the right, at its expense, to record an affidavit to be given by Seller in connection therewith.

20.   Amendment.  This Agreement may be amended or modified at any time and in all respects by an instrument in writing executed by the Purchaser and the Seller.

21.   Assignment.  Neither this Agreement nor any right created hereby shall be assignable by the Seller (or its successors in interest) without the prior written consent of the Purchaser.  Nothing in this Agreement, expressed or implied, is intended to confer upon any person, other than the parties hereto and their successors, any rights or remedies under or by reason of this Agreement.

22.   Notices.  Any notice, communication, request, reply or advice (hereinafter severally and collectively called "notice") in this Agreement provided or permitted to be given, made or accepted by either party to the other must be in writing and may be given or be served by depositing the same in the United States Mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same in person to such party.  Notice deposited in the mail in the manner herein above described shall be effective only if and when received by the parties to be notified.  For purposes of notice, the addresses of the parties shall, until changed as hereinafter provided, be as follows:

     To Seller:         Virginia Krapf
                           8978 Bainbridge Place
                           Stockton, Ca. 95209

or at such other addresses as the Purchaser may have advised the Seller in writing.

                      To Purchaser:        Virtuox, Inc.
                      5850 Coral Ridge Drive
                      Suite 304
                      Coral Springs, Florida 33076

                      Copy to:            Laurence Blair, Esq.
                      Greenspoon, Marder, P.A.
                      100 W. Cypress Creek Road, Suite 700
                      Fort Lauderdale, Florida 33309

or at such other addresses as the Seller may have advised the Purchaser in writing.

23.   Headings.  Headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11

24.     Counterpart Execution.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

25.     Parties in Interest.  All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the Purchaser and the Seller, their heirs, executors, administrators, successors and assigns.

26.     Exhibits.  All of the Exhibits and lists attached hereto (or such exhibits and lists as are required to be attached hereto prior to the closing) are incorporated herein by reference and made a part hereof.

27.     Choice of Law.  This Agreement and all amendments hereto shall be construed in accordance with Florida law.  The parties agree that any legal proceedings brought by either party in connection with or arising out of this Agreement shall be brought in Broward County, Florida and a

28.     Entire Agreement.  The foregoing and the Exhibits attached hereto (and as are required to be attached hereto) constitute the entire agreement and understanding of the parties on the subject hereof and supersede all prior agreements and understandings relating to the subject matter hereof.

In witness whereof, the parties hereto have executed this Agreement on the day and year first above written.

WITNESSES:

Virtuox, Inc., a Florida corporation

By: _____

Steven Lica, President

By: _____
Virginia Krapf, Sole Shareholder of
Oxi-Techs, Inc, a California corporation

StockExchangeAgmt02-01-2010.wps

12

# AMENDED AND RESTATED
## STOCKHOLDERS AGREEMENT
### OF VIRTUOX, INC.

This Agreement, dated for purposes of reference the 16th day of February 2009, is entered into, by and among Jonathan Fedele ("Jon"), Steven Lica ("Steven"), Kyle Miko ("Kyle"), hereinafter sometimes collectively referred to as the "Stockholders," and Virtuox, Inc., a Florida corporation, hereinafter referred to as the "Corporation."

## RECITALS:

The Corporation was incorporated on August 23, 2005, under the laws of the State of Florida.

The Corporation is authorized to issue one thousand (1,000) shares of its common stock, and has issued nine hundred ninety nine (999) of its said shares which are presently owned by Stockholders as follows:

| Name | No. of Shares |
|------|---------------|
| Jon | 333 |
| Steven | 333 |
| Kyle | 333 |

The parties hereto believe it to be in their best interest to provide for the continuity and harmony in the stock ownership and management of the Corporation and, in the event of conflict among Stockholders, to be able to preserve the Corporation as a going concern and, at the same time, to give Stockholders who may leave the Corporation a fair price for their interests.

Now, therefore, in consideration of the mutual benefits to be derived from the covenants and agreements herein contained, the parties hereto agree as follows:

1. <u>Future Capital Needs of the Corporation.</u>

    1.1    Each of the Stockholders agrees to loan or contribute to the Corporation such additional amounts as shall be needed from time to time, in the discretion of the Board of Directors of the Corporation, upon such terms and conditions as the Board of Directors of the Corporation shall determine.   In the event Stockholders are required to loan funds to the Corporation, the Corporation shall issue a promissory note evidencing the full amount of said loan and the terms of repayment, including an interest rate set by the Board of Directors.

    1.2    In the event the Directors of the Corporation determine that loans or contributions from the Stockholders are necessary, each Stockholder shall loan or contribute a proportionate amount of the required funds as his number of shares owned bears to the total number of shares issued and outstanding at the time the loan is called for by the Directors of the Corporation.

    1.3    If any Stockholder fails to loan or contribute his share of the required funds (deficit amount) after fourteen (14) days following notice by the Directors of the Corporation, the other Stockholders shall have the right, but not the obligation, to loan to the Corporation such deficit amount (deficit loan). Any deficit loan shall bear interest at eighteen percent (18%) (or the highest rate authorized by law if less than 18 percent) from the date when such deficit loan is made, until paid, with interest and principal (in that order) payable on demand.


EXHIBIT
2

1.4    The noncontributing Stockholder shall remain obligated to the Corporation to fund the deficit amount, including the amount of any accrued and unpaid interest due on the deficit loan, notwithstanding the fact that such deficit loan shall have been advanced by one or more of non-defaulting Stockholders.

1.5    If the non-contributing Stockholder shall not have contributed or loaned his share of required additional funds to the Corporation as provided in Section 1.2 within fourteen (14) days after written demand from the Secretary of the Corporation, then such noncontributing Stockholder shall not be entitled to any salary, bonus, dividend or any other corporate distribution, and his share of any distributions, which he would otherwise be entitled to receive, shall be applied by the Corporation to cure his default, until such amount is fully funded.

1.6    Each Stockholder agrees to individually execute any notes, guaranties, indemnifications or such other documents as may be reasonably required by any lender from time to time on behalf of the Corporation to obtain financing for the activities contemplated herein.

2.    <u>Corporate Purposes</u>.  The purposes for which the Corporation is organized are:

2.1    To engage in the business of diagnostic laboratory services in residences and healthcare facilities across the nation.

2.2    To own or lease such real or personal property as may be necessary or appropriate for such practice.

2.3    To exercise the powers and privileges conferred upon corporations under the laws of the State of Florida, in furtherance of and subject to the above purposes.

3.    <u>Directors of the Corporation</u>.  Each of the Stockholders to this Agreement acknowledges that the following persons are Directors of the Corporation and they were properly elected to such position:

Steven, Jon and Kyle

Each shall be entitled to be elected as a Director of the Corporation as long as he is acting in full compliance with the terms of this Agreement.

4.    <u>Officers of the Corporation</u>.  Each of the Stockholders to this Agreement acknowledges that the following persons are officers of the Corporation and they were properly elected to their respective positions:

Steven …....…........... President
Jon …………......….....Treasurer
Kyle …………………... Secretary

Each shall be entitled to be elected as an officer as long as he is acting in full compliance with the terms of this Agreement.

5.    <u>Quorum Requirements for Meetings of Stockholders and Directors</u>.

5.1    <u>Stockholder Quorum</u>.  A two-thirds (2/3) majority of the shares issued, outstanding and entitled to vote, represented in person or in proxy, shall constitute a quorum at any meeting of the Stockholders.

2

5.2     Director Quorum.   The presence of two-thirds (2/3) of the number of Directors elected to the Board of Directors of the Corporation shall constitute a quorum at any meeting of the Board of Directors.

6.      Stockholder and Director Voting.  Unless otherwise provided in this Agreement, or in the Articles of the Corporation, all action which may come before the Stockholders or Board of Directors of the Corporation shall require an affirmative vote of the majority entitled to act thereon.

7.      Duties of Directors and Officers.   Each officer and Director agrees to devote as much time as is necessary and shall use his best efforts for the business of the Corporation.  No Director or officer of the Corporation shall be entitled to compensation for his services until such time as it is unanimously agreed upon by the Directors of the Corporation. Each of the officers shall generally consult with and keep the others advised of their actions for the Corporation.

8.      Employment Contracts.  The Corporation may employ the parties to this Agreement. Any Stockholder who becomes an employee of the Corporation shall be entitled to such compensation and benefits according to such amounts and benefits as may be reasonably determined by the Board of Directors of the Corporation.

9.      Prohibited Transactions.   Other than in the ordinary course of the Corporation's business, no Stockholder or Director shall take the following actions without first obtaining the written consent of all of the Stockholders of the Corporation:

9.1     Enter into any contract, agreement or other binding relationship for which the Corporation is not receiving full and fair consideration for its premises;

9.2     Borrow money in the Corporation's name, or use collateral owned by the Corporation as security for any loan;

9.3     Make, execute or deliver any contract to sell, bill of sale, deed, mortgage, or lease, relating to any corporate assets, or his respective interest herein (except for sales of inventory in the ordinary course of business);

9.4     Possess corporate property or assign the right of the Corporation to specific property other than for a corporate purpose;

9.5     Make, execute or deliver any general assignment for the benefit of creditors;

9.6     Assign, transfer, pledge, compromise, or release any claim of the Corporation except for full payment, or arbitrate or consent to the arbitration of any disputes or controversies;

9.7     Incur. obligations on behalf of the Corporation which are reasonably expected to continue beyond three (3) months from the date contracted, or incur any liabilities in excess of Five Thousand Dollars ($5,000.00), except for obligations previously approved or incurred pursuant to an approved budget or cost breakdown;

9.8     Employ and establish the compensation payable to relatives of any of the parties hereto;

9.9     Confess a judgment against the Corporation;

9.10    Create any personal liability for any party other than the personal liability to

3

which any party may have agreed to in writing;

9.11    Loan any money or extend the credit of the Corporation to another other than in the ordinary course of business;

9.12    Cause or permit the Corporation to engage in any business or activity unrelated to its regular activities;

9.13    Do any other act set forth in this Agreement which requires the consent of another or all of the parties hereto, without first having obtained such consents; or

9.14    Borrow any money from the Corporation.

10.    Full Disclosure.   Each party agrees to inform the others on a periodic basis of his/her actions taken on behalf of the Corporation.

11.    Duty of Cooperation.   Each of the parties acknowledges and understands that the success of the Corporation's operations depends upon the full performance of the other. Notwithstanding the fact that certain duties have been delegated to various individuals, each agrees to inform the others on a periodic basis of his actions taken on behalf of the Corporation and such actions that the other expects another party to perform in order that his specific duties may be carried out.   In this respect each party who requires the assistance of another party agrees to inform the other specifically of what duties or requirements are necessary by the others in sufficient time for the others to comply with such request.

12.    Corporate Checking Account.   All corporate funds received from any and all sources shall be deposited in the name and to the credit of the Corporation in a bank or banks to be determined by the Stockholders of the Corporation, and shall only be withdrawn therefrom by check signed by either Steven, Jon or Kyle, providing, however, any nonrecurring expenditures outside of the day-to-day operations of the business in excess of Twenty-Five Thousand Dollars ($25,000.00) must first be submitted to the Stockholders for approval.

13.    Reimbursement for Expenses.   The Corporation shall reimburse any Stockholder from time to time for all authorized business expenses provided that the Stockholder presents to the Corporation documentary evidence (such as receipts or paid bills) which state sufficient information to establish the amount, date, place and essential character of the expenditure.

14.  .   Covenant Not to Compete.   Each Stockholder agrees that he shall not, directly or indirectly, within the United States, enter into or engage in general, direct or indirect competition with the Corporation in any manner with any business of the type and character carried on by the Corporation's business, either as an individual on his own or as a partner or joint venturer, or as an employee or agent, or as a lender or guarantor, for any person, firm or corporation, or as an officer, director, stockholder or otherwise during the term of this Agreement; and for a period of two (2) years after the transfer of his stock.   In this connection, it is the specific intent of the parties that a Stockholder shall not utilize any trade secrets, customer lists, nor directly solicit any customers of the business of the Corporation or prospective customers called upon by its business for the same or similar business engaged or contemplated to be engaged in by the Corporation.   This covenant on the part of the Stockholders hereto shall be construed as an agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of a Stockholder against the Corporation, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Corporation of this covenant.   In the event of a breach or threatened breach by a Stockholder of his obligations under this restrictive covenant, such Stockholder acknowledges that the Corporation will not have an adequate remedy at law and

shall be entitled to equitable and injunctive relief as may be available to restrain the Stockholder from violating the provisions hereof.  If any portion of this Agreement Not to Compete is held to be unreasonable, arbitrary or against public policy, the Agreement Not to Compete herein shall be considered divisible both as to time and as to geographical areas; and each month as specified shall be deemed to be a separate period of time.  In the event any court determines a specified time period or geographical area to be unreasonable, arbitrary or against public policy, a lesser time period or geographical area which is determined to be reasonable, non-arbitrary and not against public policy may be enforced.  In the event any court determines that the scope of non-competition is unreasonable, arbitrary or against public policy, a definition of non-competition which is determined to be reasonable, non-arbitrary and not against public policy may be enforced.  Nothing herein shall be construed as prohibiting the Corporation from pursuing any other remedies available for such breach or threatened breach, including the recovery of damages.  Each Stockholder who ceases to be a Stockholder of the Corporation shall acknowledge the provisions of this paragraph in writing upon the sale or transfer of his stock.

Notwithstanding anything stated herein to the contrary, each of the Stockholders acknowledges and agrees that one or more of the Stockholders are Stockholders and/or Members in one or more of the following entities and that any Stockholder can continue to be without violating anything contained herein:  Berlin Holdings, LLC; Coastal Care Medical Supply, Inc.; Pulmocair Respiratory, Inc.; and Infinity Health Services, Inc., all Florida entities.

15.    Distribution of Cash Flow and Profits – Return of Capital.  Each Stockholder hereto acknowledges and understands that he shall not be entitled to a return of his capital contributions to the Corporation except as specifically provided for in this paragraph.  The parties hereto agree that the cash flow and profits of the Corporation shall be applied to or distributed in the following order of priorities:

15.1    Obligations falling due to third party lenders (whether secured or unsecured) where there is a recourse to a party to this Agreement;

15.2    Obligations falling due to third parties where there is not a recourse to a party to this Agreement;

15.3    Direct operating expenses falling due;

15.4    Outstanding obligations of the Corporation to any Stockholder who has loaned monies to the Corporation;

15.5    The balance (if any) to the Stockholders in proportion to their stock ownership of the Corporation.

16.    Distributions to Stockholders.  The parties agree that the Corporation shall distribute within sixty (60) days after the end of each fiscal year of the Corporation, an amount equal to a minimum of forty percent (40%) of the net income of the Corporation for such period to its then existing Stockholders.  Such distributions shall be made unless otherwise agreed that a greater or lesser distribution shall be made or the time period shall be extended by those Stockholders owning a minimum of seventy percent (70%) stock of the Corporation.

17.    Restrictions Against Transfer.  Each Stockholder agrees that he will not transfer, assign, hypothecate or in any way alienate any of his shares (which he now owns, or may hereafter acquire) or any rights or interest therein, whether voluntarily or involuntarily, by operation of law or by judicial sale, by gift, or otherwise, unless in a transfer which meets the requirements of this Agreement.  Any purported transfer in violation of any provision of this Agreement shall be void and

ineffectual, shall not operate to transfer any interest or title in the purported transferee, and shall give the Corporation and/or the other Stockholders an option to purchase such shares in a manner and upon the terms and conditions provided for herein. Each Stockholder shall indemnify and hold the Corporation and/or the other Stockholders harmless from all costs and expenses, including reasonable attorneys' fees and court costs incurred by them as a result of any breach by such Stockholder.

18.    Lifetime Transfers – Right of First Refusal.

18.1    Notice.   In the event a Stockholder desires to sell or transfer his shares (or makes a purported transfer or alienation which does not comply with the provisions of this Agreement), said Stockholder (hereinafter referred to as "Offering Stockholder"), shall first offer or shall be deemed to offer all of his shares for sale to the Corporation and the other Stockholders, and the Corporation and the other Stockholders shall have the right to purchase all, but not less than all, of said shares. Such offer shall be in writing and sent by registered or certified mail to the principal office of the Corporation and to the other Stockholders at the addresses listed in the records of the Corporation. The notices must set forth (when applicable) the name of the proposed transferee, the number of shares subject to the offer, the terms of payment (whether for cash or credit), and if on credit, the term and interest rate, and all other consideration being received or paid in connection with such proposed transfer, as well as any and all other terms, conditions and details of such offer.

18.2    Acceptance.   The Corporation and the other Stockholders shall have sixty (60) days after receipt of such offer to accept the offer, and shall signify their acceptance by written notice delivered to the Offering Stockholder at his address appearing in the offer. If both the Corporation and the other Stockholders accept the offer, the Corporation shall have the first right to purchase the shares of the Offering Stockholder. If the Corporation does not elect to purchase all of the shares subject to the offer, and the other Stockholders desire to purchase all of such shares, each Stockholder electing to purchase such shares shall be entitled to purchase that portion of the offered shares that the number of shares held by each accepting Stockholder bears to the total number of shares held by all Stockholders electing to purchase (and actually purchasing) the offered shares. In the notice of acceptance by the Corporation or the other Stockholders, there shall be set forth a closing date not more than forty (40) days after acceptance of the offer, at which time the shares will be transferred to the purchaser and the consideration delivered to the selling Stockholder.

18.3    Purchase Price and Terms of Payment.   The purchase price per share and terms of payment for the shares purchased shall be determined according to the same terms of the third party bona fide offer made to the Offering Stockholder.

18.4    Rejection of Offer.    In the event that the Corporation or the other Stockholders do not elect to purchase all of the offered shares, the Offering Stockholder shall have the right to transfer all of his shares of stock free and clear of any restrictions against transfer, providing all of the following terms and conditions are complied with:

18.4.1    The transfer is made to the third party whose identity has been disclosed in the offer to the Corporation and the other Stockholders;

18.4.2    The transfer occurs within a period of thirty (30) days after rejection of the offer by the Corporation and the other Stockholders;

18.4.3    The transfer is made at the same price, terms and conditions as set forth in the offer by the Offering Stockholder to the Corporation and the other Stockholders; and

6

18.4.4    The third party has become a party to this Agreement, and has agreed to be bound by the terms and conditions contained herein, as may be modified.

In the event all of the above conditions are not satisfied with respect to the proposed transfer of stock, all of the restrictions contained in this Agreement on the transfer of stock shall be reinstituted.

19.    Mandatory Purchase Upon Death.  Upon the death of a Stockholder or the death of the principal of any entity Stockholder (hereinafter both shall be referred to as "Decedent"), all of the shares of the capital stock of the Corporation owned by him or the applicable entity Stockholder and to which he or his personal representative or the entity Stockholder as applicable, shall be entitled, shall be sold and purchased as provided for herein.

19.1    Obligation of the Corporation to Purchase.  The Corporation shall purchase from the Decedent's personal representative, and the Decedent's personal representative or the entity Stockholder as applicable shall sell to the Corporation, all of the shares of capital stock of the Corporation owned by the Decedent, and to which the Decedent or his personal representative shall be entitled, according to the price and terms as set forth in Paragraphs 20 and 21.

19.2    Closing.  The closing of such purchase and sale shall take place at the office of the Corporation at a date designated by the Corporation, which shall not be more than one hundred twenty (120) days following the date of the qualification of the personal representative of the deceased person, provided, however, the closing shall take place regardless of the date of the qualification of the personal representative within six (6) months of the date of death of the deceased person.  The personal representative of any Decedent shall cooperate to effectuate the purpose, intent and agreement of the parties hereto, and he shall execute all necessary documents required to carry out the terms and provisions of this Agreement.

19.3    Insufficient Corporate Surplus.  If the Corporation shall not have sufficient surplus to permit it lawfully to purchase the shares of a Decedent, the Decedent's personal representative and the surviving Stockholders shall promptly vote their respective holdings of the shares of the Corporation to reduce the capital of the Corporation, or take such other steps as may be appropriate or necessary in order to enable the Corporation lawfully to purchase and pay for all of the Decedent's shares, including, but not limited to:

19.3.1    A recapitalization of the Corporation so as to reduce its capital and increase its surplus;

19.3.2    A reappraisal of the assets of the Corporation to reflect the fair market value of such assets on the books of the Corporation (in the event such value exceeds the book value thereof) so as to increase such surplus.

In the event such surplus shall, nevertheless, prove to be insufficient to legally allow the Corporation to purchase all of such shares after having been increased as hereunder provided, then the entire available surplus, if any, shall be used by the Corporation to redeem a portion of the stock of the Decedent and the surviving Stockholders shall purchase such unredeemed stock in the proportion that the shares of stock of the Corporation owned by each surviving Stockholder bears to the total number of shares of stock of the Corporation owned by all surviving Stockholders, at the price and upon the terms and conditions that the Corporation would have redeemed the stock if the surplus had been available; provided, however, that if there is only one (1) surviving Stockholder, that Stockholder shall purchase all such unredeemed stock upon the same terms and conditions that the Corporation would have redeemed the stock if the surplus had been available.

7

20.    Purchase Price Upon Sale of Stock.  The purchase price of each share of stock to be sold under this Agreement is hereby stipulated ("Stipulated Price") to be Three Thousand Three and 00/100 Dollars ($3,003.00), subject to the adjustments herein provided.

20.1    Review of Stipulated Price.  Within ninety (90) days following the close of each fiscal year, the Stockholders shall review the Stipulated Price.  Upon such review the parties may either stipulate that there is no change in the price last stipulated, or they may agree upon a new Stipulated Price, which shall be endorsed on Exhibit "A" attached to this Agreement and made a part hereof.  If on the close of any year the Stockholders shall fail to agree upon a Stipulated Price, the price of each share to be sold under this Agreement shall its Fair Market Value.  For purposes of this Section, Fair Market Value shall mean and refer to the price which would be paid by a willing buyer to a willing seller in an arm's-length transaction for the purchase of such shares, free and clear of any option, call, contract, commitment, demand, lien, charge, security interest.  If on the close of any year the Members shall fail to agree upon a Fair Market Value, then within fifteen (15) days after any event triggering a purchase of the shares by the Corporation and/or the other Stockholders (other than in the case of a valid third party offer), the Fair Market Value of the shares as of the date of such triggering event shall be determined as follows: the Purchaser and the Seller shall each promptly, but no later than ten (10) days after the expiration of such fifteen (15) day period, appoint an appraiser (and provide notice to the other party of such appointment), who or which shall determine mutually the Fair Market Value of the shares, for purposes of an all cash sale; provided, however, that, in the event the two (2) appraisers cannot agree upon the Fair Market Value of the shares, the Fair Market Value shall be the average of the value determined by each of the (2) appraisers.  All appraisers appointed hereunder shall be qualified by experience and ability to appraise the shares (Corporation) and shall be directed to complete their appraisal within sixty (60) days after their appointment; and the fees and other costs of each of the first two (2) appraisers shall be borne by the Purchaser and the Seller appointing each such appraiser.  If either the Purchaser or Seller fails timely to appoint an appraiser, the determination of the appraiser timely appointed by the other party shall be binding on all parties.  The appraisals by all appraisers shall only value the shares based upon the net Fair Market Value of the Corporation as of the date of their appraisal, and Fair Market Value shall not include any intangible value for goodwill or future earnings which may be projected following the date of the appraisal, but shall only reflect the value of the then existing business and assets of the Corporation, less all liabilities.  For purposes of clarity, the Fair Market Value of any shares required to be determined shall be the Fair Market Value of one hundred percent (100%) of the shares multiplied by the number of shares of the Corporation which such Stockholder owns.  As a further example, if all of the shares in the Corporation are valued at One Million Dollars ($1,000,000), then fifty percent (50%) of the shares shall be valued at Five Hundred Thousand Dollars ($500,000).

20.2    Stock Splits, Etc.  Appropriate adjustment in the purchase price shall be made for any stock dividend, split up, recapitalization, or issuance by the Corporation of additional outstanding shares occurring after the fixing of the last Stipulated Price such that the total Stipulated Price of all shares before such action is then allocated among the Corporation's outstanding shares after such action.

21.    Terms of Payment.  The parties shall have the right to make the purchase provided for herein, on whatever terms the purchaser and the Offering Stockholder may agree.  In the absence of such agreement, the following provisions shall prevail:

21.1    Insurance.  If the Corporation shall receive any insurance proceeds on the life of a Stockholder or a principal of a Stockholder, the entire proceeds shall be payable to the Decedent's personal representative or the entity Stockholder as applicable, if such sale is being

made by reason of the person's death.  The amount of proceeds so paid over shall be credited against the purchase price of the shares of stock being purchased by the Corporation.

21.2   Balance of Purchase Price.  The balance of the purchase price remaining after payment of any insurance proceeds as provided in Paragraph 21.1 shall be payable on terms no less favorable to the purchaser than payment of not less than twenty percent (20%) of the total purchase price in cash at closing and delivery by the purchaser to the selling Stockholder of a promissory note for the balance of the purchase price providing for sixty (60) monthly payments to the holder thereof, bearing interest at the rate of six percent (6%) per annum.  Payment of the first monthly installment of principal and of the first monthly installment of interest shall be due one (1) month after the date of delivery of the note.  The maker of the note shall have the right to prepay the principal amount due thereon, in whole or in part, at any time without penalty and with interest to the date of prepayment. The note shall provide that it shall become due and payable in full upon the liquidation of the Corporation and shall be secured by a mortgage on all assets of the Corporation.

21.3   Indemnification.  On any purchase and sale being made pursuant to the terms of this Agreement, the purchaser(s) shall hold the selling Stockholder and/or his representatives free and harmless from all liabilities of the Corporation.  The purchaser(s) shall satisfy or obtain the release of the seller's obligations to such third parties for which the seller may be liable (or shall personally indemnify the selling Stockholder for any such liabilities on terms reasonably agreeable to the seller).

Notwithstanding the above, the term and interest rate of any promissory note which may be issued to a selling Stockholder pursuant to this Paragraph may be reviewed at the annual meeting of Stockholders according to procedures corresponding with those of Paragraph 20.1.

22.   Offset of Purchase Price by Indebtedness.   Notwithstanding the foregoing paragraphs regarding the terms of payment, in the event the seller is indebted to the Corporation or purchasers, or in the event the Corporation or the purchasers are indebted to the Seller, the following adjustments shall apply:

22.1   Indebtedness of Seller to Corporation or to Purchasers.   If a selling Stockholder whose interest is being sold to a party is indebted to a purchasing party at the time of a sale, the purchasing party to whom the indebtedness is owed shall offset and reduce the purchase price payable by that purchaser by the amount of debt the indebtedness does not exceed the purchase price.   To the extent the indebtedness is offset against the purchase price, the indebtedness shall be deemed paid; but any indebtedness in excess of the sum offset against the purchaser's purchase price shall remain due and owing to the purchaser according to its terms.  If there is more than one purchaser the indebtedness owed to any purchaser shall not offset the purchase price payable by any other purchaser.  Unless the terms of the indebtedness evidenced in writing specifically provide that this paragraph shall not apply, this offset shall apply to all indebtedness due the purchaser by a selling Stockholder even though the indebtedness has not by its terms matured at the time of the sale.

In the event a selling Stockholder shall have outstanding loans payable to the Corporation and the Corporation is not the sole purchaser of the selling Stockholder's shares; then in that event, said outstanding loan and/or obligations due to the Corporation shall be adjustments to the purchase price and shall be assumed by the purchasers, except that, to the extent the Corporation has purchased shares, that portion of the loan that is proportionate to the total number of shares sold by the seller that were purchased by the Corporation shall be considered satisfied where purchaser(s) shall be jointly and severally liable to pay the balance.

22.2   Outstanding Corporate Loans Payable to Seller.   In the event the

9

Corporation shall have any outstanding loans payable to the selling Stockholder, the terms of repayment of such loans and/or obligations shall not be affected by any purchase and sale provided for herein (unless a promissory note evidencing or contractual agreement governing such loan or obligation provides otherwise).

22.3   Outstanding Loans or Obligations to Selling Stockholder.  In the event the Corporation shall have any outstanding loans from or obligations to a selling Stockholder, then in that event, the outstanding amount of the obligations shall be evidenced by a renewal promissory note corresponding to the terms of payment and the promissory note executed by the purchaser(s) of the selling Stockholder's shares.

. 23.   Permitted Transfers of Stock.  Notwithstanding any language to the contrary contained in this Agreement, any Stockholder shall have the right to transfer all or any portion of his shares of the Corporation to any other person or entity listed below; providing such transferee has become a party to this Agreement and has agreed to be bound by the terms and conditions contained herein (or as may be modified): Parent or parents of such Stockholder, or his brothers or sisters, his spouse, his natural or adopted descendants, or the spouse of any such descendant, provided such transferring Stockholder remains in voting control of the transferee, or an inter vivos trust primarily for the benefit of the Stockholder or any person listed in this Paragraph.

24.   Termination or Retirement of an Employee/Stockholder.  In the event any Stockholder/employee of the Corporation terminates his employment without the consent of the Board of Directors, either voluntarily or involuntarily (except for disability or death), such employee/Stockholder shall offer or be deemed to offer all of his shares of stock of the Corporation for sale to the Corporation and other Stockholders for a period of ninety (90) days. The Corporation and other Stockholders shall signify their acceptance of such offer by written notice delivered to the employee/Stockholder.  If both the Corporation and other Stockholders accept the offer, the Corporation shall have the first right to purchase the shares subject to the offer.  In the notice of acceptance by the Corporation or the other Stockholder, there shall be set forth a closing date not more than forty (40) days after acceptance of the offer, at which time the shares will be transferred to the purchaser(s) and the consideration delivered to the seller.  The purchase price and terms of payment for the shares of a terminated employee/Stockholder shall be determined in accordance with provisions of Paragraphs 20 and 21; provided, however, the purchase price as so determined by Paragraph 20 shall be discounted by twenty percent (20%).  If the Corporation and/or the other Stockholders shall not elect to purchase the stock of the former employee/Stockholder, the former employer may retain his stock interest in the Corporation.

25...   Disability.  In the event any individual party to this Agreement or the principal of any entity that is a party to this Agreement who is an employee of the Corporation shall become totally disabled for a continuous and consecutive period, such disabled individual shall be entitled to receive from the Corporation the same salary that he was receiving at the time the disability occurred, reduced by any disability income insurance payments receivable by such individual for the length of the disability not to exceed twelve (12) months in the aggregate.

In the event the total disability continues for a period in excess of twelve (12) months, said salary shall terminate upon the expiration of the twelve (12) month period, and such disabled individual shall be deemed to offer all of his stock for sale to the Corporation and other Stockholders according to the terms and provisions as set forth in Paragraph 26 of this Agreement. If the Corporation and other Stockholders shall not elect to purchase the stock of the disabled Stockholder, the disabled Stockholder may retain his stock interest in the Corporation.

For purposes of this Agreement, the term "disability" shall be defined exactly as provided in the Corporation's then current Disability Buy-Out Disability Insurance Policy, if any, and

10

if not, then for purposes of this Agreement, the term "total disability" shall be deemed the inability of a Stockholder to perform all or substantially all of the duties being performed by such Stockholder at the time the disability occurred. The decision as to whether a Stockholder is totally disabled in accordance with this Agreement shall be made by two (2) independent physicians, one (1) appointed by the Board of Directors of the Corporation and the other appointed by the disabled Stockholder if he has capacity and if not, then by the Health Care Surrogate and Attorney-in-Fact of the disabled Stockholder (if one exists).

26.   Purchase of Shares by Corporation Upon Permanent Disability.  The Corporation shall purchase all of a disabled Stockholder's shares of stock offered for sale pursuant to the terms of Paragraph 25 at the price set forth in Paragraph 20 herein. Such sale and purchase shall be consummated as soon as is possible.  Any funds held in trust for the purchase of a disabled Stockholder's shares shall be paid in cash at closing. The balance of the purchase price remaining after payment of any disability insurance proceeds shall be payable in sixty (60) equal monthly installments of principal and interest, the first installment payable one (1) month from the date of closing, and the remaining installments successively monthly thereafter. The indebtedness shall be represented by a promissory note of the Corporation, endorsed and guaranteed by the remaining Stockholders, delivered to the disabled Stockholder or his representative, bearing interest at a rate not to exceed six percent (6%) per annum. The promissory note shall provide that the maker shall have the privilege of prepaying all or any part thereof, with interest to the date of prepayment, and shall provide for the maker to pay all costs and expenses of collection, including a reasonable attorney's fee.

26.1   Insufficient Corporate Surplus.  If the Corporation shall not have sufficient surplus to permit it lawfully to purchase all of said shares, the disabled Stockholder and the other Stockholders shall promptly vote their respective holdings of shares to reduce the capital of the Corporation, or take such other steps as may be appropriate or necessary in order to enable the Corporation lawfully to purchase and pay for all of the disabled Stockholder's shares, including without limitation, an up-to-date appraisal of the assets of the Corporation. If the Corporation shall nevertheless be unable to refuse to purchase all of the disabled Stockholder's shares, the obligation of the Corporation with respect to the shares which the Corporation shall be unable or refuse to purchase shall be deemed assumed by the other Stockholders.

27.   Violation of Covenant Not to Compete.  In the event a Stockholder should violate the terms of his agreement contained in Paragraph 14 and compete, either directly or indirectly, with the business of the Corporation in the State of Florida ("Competing Stockholder"), he shall be required to offer, or shall be deemed to offer, his shares of stock of the Corporation for sale to the Corporation and the other Stockholders, and the Corporation and other Stockholders shall have the right to purchase all, but not less than all, of said shares.

The Corporation and the other Stockholders shall have ninety (90) days after the occurrence of such event to purchase all of the stock of the Competing Stockholder. If the Corporation or the other Stockholders elect to purchase the stock of the Competing Stockholder, they shall so notify him and set forth a closing date not more than sixty (60) days after acceptance of the offer, at which time the shares will be transferred to the purchaser and the consideration delivered to the Competing Stockholder.

The purchase price and terms of payment for each share purchased shall be an amount equal to the book value per share of the Corporation's assets determined by the accountant regularly servicing the Corporation based upon financial statements prepared in accordance with generally accepted accounting principles. In computing book value, there shall be no allowance for goodwill and all real and tangible personal property shall be taken into account at its depreciated value as shown on the books of the Corporation.

11

The purchase price shall be payable on no terms less favorable to the purchaser(s) than payment of not less than twenty percent (20%) of the total purchase price in cash at closing and delivery by the purchaser to the Competing Stockholder of a promissory note for the balance of the purchase price providing for sixty (60) monthly payments, bearing interest at the rate of six percent (6%) per annum. Payment of the first monthly installment of principal and of the first monthly installment of interest shall be due one (1) month after the date of delivery of the note. The maker of the note shall have the right to prepay the principal amount due thereon, in whole or in part, at any time without penalty and with interest to the date of prepayment.

28.  Deadlock; Buy-Sell Procedures.

28.1  In the event any matter of dispute arises between the Stockholders which cannot be resolved according to the terms of this Agreement or between the parties (hereinafter called "deadlock") any party or parties shall have the right to institute the buy-sell procedures set forth in Paragraph 28.2 below. In the event such procedures shall not be instituted by any of the Stockholders within fourteen (14) days after notice by any Stockholder to the other(s) of the existence of a deadlock, the Stockholders shall proceed in accordance with Paragraph 28.3 hereof.

28.2  In the event of a deadlock, any Stockholder shall have the right to institute the procedures described below. The Stockholder (or Stockholders) instituting the procedures is (are), for purposes of this section, hereinafter called "Moving Group" and the other Stockholder (or Stockholders) is (are), for purposes of this section, hereinafter called "Other Group."

28.2.1  The Moving Group shall deliver to the Other Group an offer ("Offer") in writing, stating the purchase price under which the Moving Group is willing to purchase the interest in the Corporation of the Other Group. Such price shall be stated in terms of the price attributable to 100% of the value of the Corporation. The Other Group then shall be obligated either:

(a)  To purchase the interest of the Moving Group in the Corporation at a price equal to the one hundred percent (100%) value referred to above multiplied by the Moving Group's interest in outstanding stock of the Corporation; or

(b)  To sell to the Moving Group the interest of the Other Group in the Corporation at a price equal to the one hundred percent (100%) value referred to above multiplied by the Other Group's interest in outstanding stock of the Corporation.

The Other Group shall given written notice of such election to the Moving Group within seven (7) days after receipt of the offer. Failure of the Other Group to give the Moving Group notice that the Other Group has elected under subsection 1(a) above shall be conclusively deemed to be an election under 1(b) above.

If there shall be more than one purchaser, such purchasers shall purchase the Stock of the sellers in the proportion that their number of shares of Stock bears to each other, unless agreed otherwise.

28.2.2  The closing of a purchase pursuant hereto shall be held at a mutually acceptable place on a mutually accepted date not more than thirty (30) days after receipt of the written notice of the Other Group's election above. At such closing, the selling party shall assign to the purchasing party the stock in the Corporation so sold free and clear of all liens, claims, and encumbrances. The purchasing party shall pay twenty percent (20%) of the purchase price in cash or by a cashier's or certified check from a bank acceptable to the selling party at the closing.

The remaining balance of the purchase price shall be evidenced by a promissory note bearing interest at six percent (6%) per annum. Such note shall be payable in forty-eight (48) equal monthly installments of principal and interest, the first installment falling due one month from the date of closing. Such note shall be secured by a mortgage on all assets of the Corporation. At the closing, the purchasing party shall obtain the release of the selling party from all obligations of the Corporation which may have been personally guaranteed by the selling party. If such releases cannot be obtained, the purchasing party shall personally indemnify the selling party.

28.2.3    If either the Moving Group or the Other Group elects, pursuant to Paragraph 28.2 hereof, to purchase the interest of the other in the Corporation but thereafter does not close the purchase of such interest pursuant hereto, then such party shall be deemed to be in default and the other party in addition to his rights and remedies, may (i) continue the Corporation, (ii) purchase the interest in the Corporation of the defaulting party at the purchase price determined by multiplying the defaulting party's interest in outstanding stock of the Corporation by the purchase price attributable to one hundred percent (100%) of the Corporation as set forth in the offer, or (iii) liquidate the Corporation under terms corresponding to those of Paragraph 28.3. The purchase price shall be paid as provided in Paragraph 28.2.2 above.

28.3    In the event that none of the Stockholders shall institute the buy-sell procedures set forth in Paragraph 28.2 hereof within the time period prescribed, the Stockholders shall attempt to sell the assets of the Corporation to a third party or parties on terms mutually agreeable to both Stockholders, and if this cannot be accomplished, either Stockholder shall have the right to require the immediate dissolution of the Corporation whereupon the Stockholders shall file the appropriate certificates and instruments for dissolution. The Stockholders shall then take all necessary action to liquidate the Corporation, and such dissolution and liquidation shall be carried out with all reasonable speed and the distribution of assets of the Corporation shall be made as promptly as possible in accordance with the laws of the State of Florida.

29.    Insurance Trust.

29.1    Purposes.  The purpose of establishing a life insurance trust under this Agreement is to assist the surviving Stockholders in satisfying the Corporation's mandatory purchase obligations which arise under Paragraph 19 hereof following the Death of a Stockholder. The Corporation's purchase obligation under Paragraph 19 hereof, however, is mandatory, whether or not this insurance trust ever becomes effective. Therefore, if the Corporation fail to purchase life insurance to implement the terms of this trust, or purchase insurance in an amount which is insufficient to satisfy its obligations under this Agreement, all the terms and conditions of this Agreement concerning the payment of the purchase price of the shares shall remain as set forth herein.

29.2    Establishment of Trustee.

A.    Designation of Trustee. The parties acknowledge that, by executing this Agreement, they duly have designated Joseph Mott, CPA to the position of Trustee (the "Trustee"), and Joseph Mott, CPA hereby accepts appointment as the Trustee.

B.    Shares.  Contemporaneously with the execution of this Agreement, the Stockholders shall deliver to the Trustee the certificates representing their respective shares (the "Certificates"). At the time of said delivery to the Trustee, the Stockholders shall either endorse each of the Certificates in blank or deliver stock powers signed in blank for each of the Certificates. If any of the Stockholders acquire additional shares, they likewise shall deposit with the Trustee the Certificates representing such shares either endorsed in blank or with stock powers as aforesaid. The Trustee's sole obligation concerning the Certificates shall be to retain and deliver the same

13

pursuant to the provisions of this Agreement. The Trustee shall have no other obligations, rights, liabilities or duties with respect to the shares which the Certificates represent. If the Stockholders consummate any transfer of their respective shares for a reason other than death, they immediately shall notify the Trustee in writing of such transfer, and shall deliver such documents to the Trustee as are necessary to evidence and effectuate such transfer.

    C. Insurance Policies. The Corporation has delivered to the Trustee the insurance policies which are described on attached and incorporated Exhibit "C". Each policy shall provide that its proceeds shall be payable to the Trustee. The Corporation has directed the insurance companies which issued the existing policies, and immediately shall direct the insurance companies which issue policies in the future, to designate the Trustee as the owner and beneficiary of the policies. The Corporation shall have the right to acquire additional insurance on the respective lives of the Stockholders, whenever, in its discretion, it believes it is desirable to effectuate the terms of this Agreement. The Stockholders shall not have the right to change the named beneficiary of any policy, except upon the written agreement of the Corporation and all the Stockholders then living and owning shares.

    29.3 Rights of Ownership. Except as this Agreement otherwise expressly provides, each of the Stockholders shall be the owner of their respective shares while on deposit with the Trustee, and the shares shall remain registered in their respective names in the Corporation's books and records. The Stockholders shall retain all voting, dividend and other rights with respect to the shares they deposit with the Trustee, until such time as the Trustee delivers such Stockholder's shares to any purchaser in accordance with the terms of this Agreement.

    29.4 Payments of Premiums.

    A. Obligations to Pay. Although the Trustee shall be named as the owner and beneficiary of the policies, the Corporation shall remain responsible to pay all premiums on the policies on the lives of the Stockholders it obtains and deposit in trust under this agreement.

    Each Stockholder agrees to cause the insurance company which is the issuer of any policy to send the other Stockholders and the Trustee premium due notices and premium paid receipts with respect to each policy. The Trustee is not obligated to pay any premiums or assessments on the policies or to keep itself informed about the Corporation's payment or non-payment of premiums on such policies. The Trustee, prior to the death of a Stockholder, shall have no duties with respect to any policies, except to act as depository for them in accordance with this Agreement.

    B. Failure to Pay. If the Stockholders become obligated to pay premiums for the Policies personally, and a Stockholder fails to pay his allocable portion of any premium due on any Policies, the other Stockholders, in their sole discretion, may pay such premiums. If any party to this Agreement pays a premium on behalf of a defaulting Stockholder, such defaulting Stockholder shall repay such paying party, on demand, the full amount of the premium so paid, plus ten percent (10%) interest per year from the date of the payment of the premium until the date on which the defaulting Stockholder repays such premiums, plus all associated interest as aforesaid, in full. If the party which paid such premium has to use the services of an attorney or collection agency to collect such repayment (and/or associated interest), the defaulting Stockholder shall pay on demand all such legal fees, collection fees and court costs which such paying party incurs. The party paying any such premium on behalf of the defaulting Stockholder shall provide notice to the Trustee of the same, and shall keep the Trustee informed as to the repayment or failure to repay the same by the defaulting Stockholder.

    29.5 Trustee's Duty to Collect Insurance Proceeds. After receiving notice of the death a Stockholder from such Shareholder's Legal Representative, the Trustee shall perform such

actions as it deems necessary to collect the proceeds from the Policies that are on deposit with the Trustee which insure the life of such deceased Shareholder (the "Gross Proceeds"). The Trustee's receipt of Gross Proceeds shall be a complete discharge of the insurance companies and associations making such payments from further liability under such Policies. The paying insurance companies and associations shall not be required to monitor, supervise or in any manner direct the Trustee's application of Gross Proceeds. The Trustee is authorized to take any and all actions (including court proceedings) which it deems necessary or desirable to collect the Gross Proceeds from the Policies. The Trustee, however, shall not be required to institute any action for the collection of any such Gross Proceeds, unless the other parties to this Agreement indemnify the Trustee to its satisfaction against the associated costs, including but not limited to attorneys' fees, expenses of investigation and the costs of any court action. With the consent of the surviving Shareholders and the deceased Shareholder's Legal Representative, the Trustee may compromise, arbitrate, abandon or adjust any action, suit, proceeding, dispute, claim or demand relating to the Policies or the Gross Proceeds.

        29.6   Purchase Following Death.

        A.   General. With respect to a sale of shares due to the death of a Shareholder, all Net Proceeds which the Trustee receives from the Policies on the life of such deceased Shareholder shall be available for paying the Purchase Price on behalf of the surviving Shareholders. The Trustee shall dispose of the Net Proceeds in accordance with Paragraphs 20 and 21.

        B.   Purchase Price Equal To or Less than Net Proceeds. If the amount of the Purchase Price which the surviving Shareholders owe is equal to or less than the Net Proceeds, then the Purchase Price shall be increased to equal the amount of the Net Proceeds. The Trustee shall pay the entire amount of the Net Proceeds to the Legal Representative of the deceased Shareholder in accordance with the provisions of Paragraph 21.

        C.   Purchase Price Exceeds Net Proceeds. If the amount of the Purchase Price which the surviving Shareholders owe exceeds the Net Proceeds, then the Trustee shall pay the entire amount of the Net Proceeds to the Legal Representative in accordance with the provisions of Paragraph 21 hereof and the remaining unpaid balance shall be paid in accordance with the provisions Paragraph 21.

        29.7   Transfer of Shares.

        A.   Documents. If at the time of the death of a Shareholder, any of his Certificates are not then on deposit with the Trustee, then at or before the closing for the sale of such deceased Shareholder's shares under this Agreement, the Legal Representative of such deceased Shareholder shall deposit such Certificates with the Trustee, together with all assignments, endorsements, stock powers and court orders which the Trustee deems necessary to effectuate a transfer of the deceased Shareholder's shares to the surviving Shareholders.

        B.   Payment In Full at Closing. After the delivery to the Legal Representative of the entire Purchase Price, whether in the form of cash, registered or certified check, or a combination of both, the Trustee shall retain all of the Certificates deposited with the Trustee which the deceased Shareholder formerly owned, together with the assignments, endorsements, stock powers and court orders, if any, relating to said Certificates which transfer the same to the purchasing surviving Shareholders. If following the death of a Shareholder, there is only one surviving Shareholder and the Purchase Price is paid in full, the Trustee shall deliver all of the Certificates, and related assignments, endorsements, stock powers and court orders to such surviving Shareholder and the trust arrangement and this Agreement shall terminate.

C.    Payment by Note. If a Note is delivered evidencing the balance of any portion of the Purchase Price due to the estate of a deceased Shareholder, the Trustee shall hold all of the Certificates which the deceased Shareholder formerly owned, as well as the Pledge and Security Agreement and all related documents transferring the deceased Shareholder's shares to the Corporation, until the Corporation completes payment of the Note or Notes comprising part of the Purchase Price. If there is more than one surviving Shareholder following payment in full for such deceased Shareholder's shares, the Trustee shall retain, subject to this Agreement, all the Certificates and other documents which concern the shares. If there is only one surviving Shareholder, then upon complete payment of the Purchase Price and all associated interest, the Trustee shall deliver all then remaining Certificates and documents transferring the deceased Shareholder's shares to such surviving Shareholder. If the Corporation defaults in the payment of the Note given to evidence the Purchase Price for a deceased Shareholder's shares, and such default continues for a period of thirty (30) days after written notice of such default, then all of the Corporation's rights to the deceased Shareholder's shares shall terminate, and the Trustee shall have the authority to return the Certificates which represent the portion of such deceased Shareholder's shares which the Corporation purchased, along with the original Note and associated Pledge and Security Agreement, to such deceased Shareholder's successor or Legal Representative, immediately upon the Trustee's receipt of a written request from such successor or Legal Representative, in which such successor or Legal Representative represents that such default has occurred and continued uncured for said thirty (30) days period.

29.8    Release of Trustee. Upon the consummation of the sale of a deceased Shareholder's shares to the last, surviving Shareholder and the completion of payment for such deceased Shareholder's shares, the Trustee shall have no further duties or responsibilities under this Agreement, and the Trustee shall have no liability of any type or nature to any individual or entity.

29.9    Trustee's Rights.

A.    Compensation. The Trustee shall be entitled to reasonable compensation for its services and shall be reimbursed for all expenses it incurs when performing its duties under this Agreement. The Trustee shall have the right to deduct the amount of any fees, costs or expenses which it incurs while performing its duties under this Agreement from any funds (including, but not limited to, Gross Proceeds or Net Proceeds of insurance policies) which it holds in trust under this Agreement. The Corporation shall be responsible for any payments to be made to the Trustee pursuant to the provisions of this Paragraph 29.9.

B.    Certain Actions. The Trustee shall be protected in acting upon any certification, statement, request, consent, agreement or other instrument which it in good faith believes to be genuine and to have been signed and delivered by the proper person or persons. If the Trustee receives any instructions with respect to Certificates, Policies or proceeds from Policies which the Trustee holds, that the Trustee believes conflict with either the instructions it received from any other party or with any of the terms of this Agreement, then the Trustee, in its sole discretion, may refrain from taking any action other than to keep safely such Certificates, insurance policies or proceeds of insurance policies, until such conflict is resolved to the Trustee's satisfaction. If the Trustee is unable to decide upon what action to take, it shall advise the Shareholders and the Legal Representative of such indecision. The Trustee then shall withhold performance of its duties under this Agreement until such time as either all the parties then bound by this Agreement direct the Trustee in writing to take a specific action, or a court order or arbitrator's decision directs the Trustee to take a specific action.

C.    Limitation of Liability. The Trustee shall be liable under this

16

Agreement only for its bad faith in the performance of its duties. If the Trustee performs any act or refuses to act, pursuant to the order of a court of competent jurisdiction, then such act or refusal to act shall be deemed conclusively to have been performed or omitted in good faith. The Trustee's duties and responsibilities are limited to those expressly set forth in this Agreement. The Trustee shall not be subject to, nor obliged to recognize, any agreement between the parties, even though such agreement may make specific reference to the Trustee's responsibilities, other than this Agreement. The Trustee, however, may consent to such additional responsibilities or obligations by executing a written instrument signed by all the parties to this Agreement acknowledging the same.

29.10   Effect of Judicial Action Concerning the Trust Account. If a court order at any time attaches, garnishes or levies upon any items on deposit with the Trustee, or if a court stays or enjoins the assignment, conveyance, transfer or delivery of any items which the Trustee holds, or if a court enters any judgment or decree which affects all or a portion of the property which the Trustee holds, then the Trustee is authorized, in its sole discretion, to rely upon and comply with such order, writ, judgment or decree. If the Trustee complies with any such order, writ, judgment or decree, the Trustee shall not be liable to the Shareholders, any successor of a deceased Shareholder or to any other person, entity, firm or corporation by reason of such compliance, even though such writ, order, judgment or decree subsequently may be reversed, modified, annulled, set aside or otherwise vacated.

29.11   Indemnification. The Shareholders and their respective successors and assigns jointly and severally shall indemnify, defend and hold harmless the Trustee from and against any and all liabilities and reasonable expenses, including but not limited to attorneys' and accountants' fees, investigation costs, travel costs, transcript costs, disbursements, settlement amounts, judgments, fines or penalties which the Trustee may incur in connection with, in settlement of or resulting from any claim, action, suit or proceeding, whether civil, criminal, administrative or investigative (including any associated appeals) which involve or threaten the Trustee, as a party or otherwise, in connection with or in any way based upon the trust arrangement which this Agreement establishes.

29.12   Resignation or Termination. Any Trustee may resign at any time by providing thirty (30) days prior written notice to the Shareholders of its intention to resign. The Shareholders may terminate a Trustee at any time by delivery to it of a written instrument which all the Shareholders execute that terminates its position as trustee. Upon such resignation or termination, the Trustee shall deposit all property which the Trustee then holds with such successor as the Shareholders may designate in a written instrument

29.13   Successor. If a Trustee resigns or is terminated, the Shareholders shall appoint one or more successor trustees by executing a written instrument which both identifies the successor trustees and contains the acceptance of such successor trustees evidenced by said successors' signature. The resigning Trustee shall deliver to the successor trustee all of the property which the Trustee then holds. Each such successor trustee shall have all of the rights, powers, titles, duties, discretions and immunities of the original. No successor trustee shall be liable personally for any act or failure to act of any predecessor. A successor trustee may accept the accounts rendered and the property delivered by a predecessor trustee as a full and complete discharge of such predecessor trustee, without incurring any liability or responsibility for so doing. If the Shareholders cannot agree on a successor trustee, then Laurence I. Blair, Esquire shall act in that capacity if he so elects to do so.

30.   Default.

30.1   Events of Default.   The occurrence of any of the following events shall constitute an event of default ("Event of Default") hereunder:

17

30.1.1   Default in the performance of any material agreements or material obligations or duties of a party having an adverse effect upon the Corporation herein contained or contained in any other written agreement in connection with the business of the Corporation if said default continues for a period of fifteen (15) days after notice to the defaulting party of the occurrence thereof; except that an Event of Default shall not be deemed to have occurred if due to unforeseeable circumstances beyond the reasonable control of any party or if any such default has not caused actual damages to the Corporation and is of a nature that reasonably requires more than fifteen (15) days to cure, is capable of being fully cured within a reasonable time  and the defaulting party is diligently proceeding to cure said default;

30.1.2   A transfer by any party of all or a part of his stock hereunder except as may be permitted herein;

30.1.3   A material misstatement by any party of any agreements, representations or warranties.

31.   Liquidation of the Corporation.

31.1   Termination.  The Corporation shall be terminated upon the occurrence of any of the following events:

31.1.1   An Event of Default has occurred as provided in Paragraph 30 hereof, and the non-defaulting Stockholders elect to dissolve the Corporation;

31.1.2   The Stockholders mutually agree to liquidate or dissolve the Corporation; or

31.1.3   The sale or other disposition of all the Corporation's properties and investments.

31.2   Effect of Termination.

31.2.1   Upon the termination of the Corporation, regardless of how it is terminated, the Corporation shall immediately commence to wind up its affairs and the Stockholders shall proceed with reasonable promptness to liquidate the business of the Corporation.  To the extent that the Corporation is not completely liquidated within six (6) months from the date of termination, the remaining assets shall forthwith be disposed of at a public sale.  It is understood and agreed that any of the Stockholders may purchase at such sale.  The management of the Corporation shall be in the exclusive control of the non-defaulting Stockholders if the venture is terminated as a result of the default of one of the Stockholders.

31.2.2   If the Corporation is dissolved for any reason while there is work in progress on the project, winding up of the affairs and termination of the business of the Corporation may include completion of the work in progress as the Stockholders not in default hereunder may determine to be necessary to bring matters to a state of completion (on that stage or phase then in progress) convenient for the cessation of work, giving due regard to the interest of the other Stockholders.

31.3   The assets of the Corporation shall be applied or distributed in liquidation in the following order of priority:

31.3.1   To the creditors of its business (other than the parties) in payment

18

of its debts and obligations;

31.3.2   To the non-defaulting Stockholders, all loans, including interest thereon and capital contributions;

31.3.3   To the defaulting Stockholder, all loans, interest thereon and capital contributions; and

31.3.4   The balance, if any, to the Stockholders in proportions to their share ownership.

31.4   Every effort shall be made to dispose of the assets of the Corporation so that the distributions may be made to the parties in cash. If this cannot be reasonably achieved, any non-cash asset shall be distributed in kind to the Stockholders, in lieu of cash, proportionately to their right to receive the assets of the Corporation, reflecting the fair market value of the assets so distributed.

32.   Representations and Warranties of Each Stockholder. Each Stockholder represents and warrants that the execution, delivery and performance of this Agreement and all documents, certificates and instruments required to be executed in connection herewith, have been duly authorized in accordance with all laws, and no further corporate action, including without limitation the vote or written consent of each Stockholder's Board of Directors or Stockholders entitled to vote is necessary on the part of each Stockholder to make this Agreement and all actions which may be required in accordance herewith valid and binding upon such Stockholder.

33.   Cancellation of Prior Stockholders' Agreement. The parties hereby agree that all other Stockholders' agreements previously entered into between or executed by the Stockholders of the Corporation and the Corporation are hereby canceled and are of no force and effect.

34.   Right of First Refusal. In the event the Corporation receives a bona fide written offer from a third party to purchase its assets which a majority of the Stockholders desire to accept, then any Stockholder not consenting to such sale (a "Non-Consenting Stockholder") shall have ten (10) business days following the meeting of the Stockholders where such sale offer was presented to the Corporation to exercise a right of first refusal to purchase the assets of the Corporation, unless otherwise extended by the terms and conditions of this Section. In the event a Non-Consenting Stockholder fails to elect to purchase the assets of the Corporation within said ten (10) business day period, then the Corporation shall have the right to sell its assets to the third party for a purchase price not less than the purchase price, and on terms not more favorable to the purchaser, than those presented to the Stockholders at the meeting of the Stockholders to consider such third party offer.

In the event a Non-Consenting Stockholder fails to exercise his/her right to purchase the assets of the Corporation within the ten (10) business day period referred to above, and either (i) the Corporation subsequently offers to sell its assets at a purchase price which is less than the purchase price originally contained in the offer presented to the Stockholders, or (ii) the Corporation subsequently offers to sell its property on more favorable terms than originally contained in the offer presented at the meeting of the Stockholders, then in either such event, the Non-Consenting Stockholder shall have another ten (10) business days to once again exercise his/her right of first refusal to purchase the assets of the Corporation by written notice to the Corporation within such ten (10) business day period.

In the event any Non-Consenting Stockholder exercises his/her right of first refusal to purchase the assets of the Corporation in accordance with this Section, then the purchase price of the assets shall be the purchase price contained in the written offer of the third party presented to

19

the Corporation, unless all Stockholders mutually agree to the contrary.  Furthermore, with respect to the terms of payment, the Non-Consenting Stockholder who exercises his/her right of first refusal shall pay the purchase price on the same terms as contained in the written offer delivered to the Corporation.  Within fifteen (15) days after any Non-Consenting Stockholder exercises his/her right of first refusal, the parties shall enter into a formal contract for sale and purchase containing the same terms and conditions as contained in the bona fide written offer, except as the parties may mutually agree to the contrary.  In the event that more than one Non-Consenting Stockholder elects to purchase the assets of the Corporation, then those Non-Consenting Stockholders exercising their right of first refusal hereunder shall jointly purchase the assets of the Corporation in the proportion that their stock ownership in the Corporation bears to each other, or as they may otherwise agree.

In the event a Non-Consenting Stockholder exercises his/her right of first refusal to purchase the assets of the Corporation as provided for above, the closing of the subject transaction shall occur on the same day as stipulated in the third party offer, unless all Stockholders agree to the contrary in writing.

In the event a Non-Consenting Stockholder fails to exercise his/her right of first refusal to purchase the assets of the Corporation, and the Corporation proceeds to sell its assets to the third party in accordance with the terms and conditions contained herein, the Non-Consenting Stockholder shall deliver to the Corporation a waiver of his/her right in recordable form no later than five (5) business days prior to the date of closing of the sale of assets of the Corporation.

This right of first refusal shall automatically terminate for any Stockholder at such time as he/she ceases to be a Stockholder of the Corporation.

35.    Procedure for Appraisals.

35.1    Within ten (10) days after an appraisal is required under any provision hereof, each group or individual, as the case may be, shall select an appraiser.  If either party fails to name an appraiser within the specified time, the other party may select a second appraiser.  The two appraisers so selected shall proceed promptly to determine the value in question of the offered interest.  The determination of such value by the two appraisers, selected as herein provided, shall be final and binding on all parties.

36.    Agreements by Corporation.  In consideration of the premises, the Corporation agrees for itself and for its successors and assigns:

36.1    Insofar as it is proper or required, it consents to this Agreement;

36.2    It will not transfer or reissue any of its shares in violation of this Agreement, or without requiring proof of compliance with this Agreement; and

36.3    All share certificates issued by the Corporation during the life of this Agreement shall be endorsed as stated in Paragraph 48.

37.    Issuance of Additional Shares of Stock.  Notwithstanding anything herein contained to the contrary, the Stockholders shall not approve a recapitalization of the stock of the Corporation, or a stock split, stock dividend, or reclassification or issuance of new shares, unless such action is taken for the purpose of raising additional capital and such shares are sold for a minimum amount equal to the then book value per share of the existing issued and outstanding shares.  Any action taken with respect to the shares shall be by unanimous consent of the Stockholders.

20

38.     Attorneys.  The parties acknowledge that the law firm of Greenspoon Marder, P.A. has represented the Corporation in connection with the negotiation of this Agreement and its formation and that all fees and other expenses charged in connection with said services shall be paid by the Corporation. Each of the parties to this Agreement have been advised to obtain separate, independent counsel to represent them in connection with this Agreement, and all negotiations leading up to this Agreement.

39.     Election for Tax Purposes.  The Stockholders acknowledge that the Corporation has elected to be taxed as a "Small Business Corporation" under Subchapter "S" of the Internal Revenue Code.  The Stockholders agree that they shall continue such election unless they unanimously agree otherwise.  Neither of the parties, without the written consent of the other, shall take any action or make any transfer or other disposition of his/her shares of stock in the Corporation which will result in the termination or revocation of such election.

40.     Insurance.  The Corporation may be the applicant for and owner of policies of insurance on the lives and/or disability of its Stockholders.  In such case the Corporation shall pay all premiums on the policies as they become due and shall give proof of payments thereof to any requesting Stockholder within twenty (20) days after the due date of each premium.  If any premium is not paid within twenty (20) days after its due date, any Stockholder shall have the right to pay such premium and be reimbursed therefor by the Corporation.  The insurer of each policy is hereby authorized and directed to give any Stockholder, upon his written request, any information with respect to the status of any policy on his life.

41.     Purchase by Corporation.  Whenever the Corporation shall be required to purchase shares of the Corporation pursuant to this Agreement, each Stockholder and/or the personal representative of any Decedent shall do all things and execute and deliver all papers as may be necessary to consummate such purchase.  Any note required to be given hereunder by the Corporation as part of the purchase price shall be endorsed and guaranteed by the remaining or surviving Stockholders, as the case may be, who shall not be discharged from such liability by reason of the subsequent execution, modification or renewal of any such note.

42.     Purchase by Stockholder.  Whenever any Stockholder purchases shares under this Agreement, such purchaser (unless he shall have paid the entire purchase price in cash) shall, following delivery of the purchased shares, endorse the newly issued certificates issued to such purchaser and deliver the same to an escrow agent as collateral security for the payment of the unpaid purchase price, and such shares shall be so held until the entire purchase price shall be paid.  While such shares shall be so held as collateral security and so long as the purchaser is not in default, the purchaser shall be entitled to all voting, dividend and all other rights with respect thereto.

43.     Indemnification.    The Corporation shall indemnify any director, officer, or Stockholder/employee of the Corporation who is a party to this Agreement for any costs, payments, expenses and damages incurred by said individual in connection with the defense of any action, suit, or proceeding in which he is made a part of by reason of being or having been such director, officer or Stockholder/employee, except for gross negligence or intentional wrongdoing on the part of the individual; provided, however, that in all events such individual shall indemnify and hold harmless the Corporation in respect of any action, suit, cost, claim, demand payment or liability arising by reason of any and all gross negligence and/or intentional wrongdoing on the part of such individual.

44.     Purchase of Insurance Policies by Stockholders.  If, pursuant to the provisions hereof, any insured Stockholder during his lifetime ceases to be a party to this Agreement, such Stockholder shall have the right to purchase from the Corporation the policies of insurance on his

21

life held by the Corporation hereunder (providing that such policies are transferrable), at a price equal to the cash surrender value plus the unearned premiums, and accumulated dividends and accrued interest thereon, determined at the date of such cessation. Such right of purchase shall be exercised by notice given to the Corporation within sixty (60) days after such cessation, and the payment of the purchase price shall be made in cash within such period of time. On receipt of the purchase price, the Corporation shall deliver the policies of Insurance and shall execute all necessary instruments of transfer.   All policies of insurance not so purchased by the insured Stockholder shall be released from the terms of this Agreement.

45. **Definitions.** For purposes of this Agreement:

45.1   The term "transfer," "dispose," or any similar term means any sale, exchange, gift, bequest, pledge, security interest, or other alienation or disposition whatsoever of any shares of the Corporation or any interest therein, including any distribution by an executor, administrator or trustee.

45.2   The term "involuntary transfer" means any transfer or disposition of shares under judicial order, legal process, execution, attachment, or enforcement of a pledge, trust or other security interest.

45.3   The term "shares," or "stock," means all stock of the Corporation, and similar securities other than non-convertible debt obligations of the Corporation, and includes the shares presently outstanding and all stock and securities which may hereafter be issued by the Corporation.

45.4   The term "shareholder" or "Stockholder," means those Stockholders who are at the time owners of record upon the books of the Corporation of any of its shares issued.

45.5   The term "personal representative" shall also include any trustee, executor or administrator of a deceased Stockholder's estate.

46. **Resignation of Stockholder.** Each of the Stockholders agrees that upon the sale or other disposition of his shares of stock of the Corporation, he shall promptly submit to the Corporation his resignation as either a director and/or officer of the Corporation. The parties hereto agree that the failure of any director or officer to resign shall be deemed sufficient cause for his removal by the Stockholders of the Corporation.

47. **Notices.** Any and all notices, consents, offers, acceptances, or any other communication provided for herein, shall be given in writing by registered or certified mail which shall be addressed, in the case of the Corporation, to its principal office, and in the case of any Stockholder, to his/her current address appearing in the records of the Corporation, or to such other address as may be designated.

48. **Endorsement of Stock Certificate.** Upon the execution of this Agreement and simultaneously herewith, each Stockholder shall present all of their share certificates of stock to the Corporation, and said certificates of the capital stock of the Corporation shall be endorsed as follows:

"This certificate is subject to the provisions of a Stockholders Agreement dated the ___ day of _____, 2009, the original of which is on file in the minute book of the Corporation.

The parties hereto agree that all stock of the Corporation not presently owned by the

22

Stockholders or hereafter issued or acquired by the Stockholders shall be subject to this Agreement and shall have endorsed thereon the appropriate notice contained in this Paragraph.

49.     Voting. The Stockholders agree at all times to vote their respective shares and to take or cause to be taken such other action as may be necessary during the term of this Agreement to cause the Corporation to effect each of the acts and actions required by the terms of this Agreement.

50.     Ratification by Corporation. It is agreed that the provisions agreed to herein shall constitute corporate action consented to by written action in lieu of holding a meeting pursuant to Florida Statutes, Sections 607.0821 and 607.0704.

51.     Specific Performance. The parties hereto agree that it is impossible to measure in money the damages which will accrue to a party by reason of the failure of any party to perform any of the obligations under this Agreement. Therefore, if any party hereto shall institute any action or proceeding to enforce the provisions of this Agreement, any person, including the Corporation, hereby waives a claim or defense therein that such party has an adequate remedy at law.

52.     Authority in Compliance with Agreements. Each of the parties represents that the execution of this Agreement by them does not conflict with or violate any contract or agreement to which such person is a party or by which he or she may be bound and is not contrary to any order of any court to which he or she is subject.

53.     Modification. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all of the parties hereto.

54.     Construction. This Agreement and all amendments hereto shall be construed in accordance with Florida law.

55.     Entire Agreement. This Agreement sets forth the entire understanding of the parties, and it may not be changed except by written document signed by all the parties hereto.

56.     Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

57.     Binding Effect. This Agreement shall be binding upon and shall operate for the benefit of the parties hereto and their respective successors, assigns, personal representatives, beneficiaries and distributees.

58.     Conflict with Bylaws. In the event of a conflict between the provisions of this Agreement and the Bylaws of the Corporation, the provisions of this Agreement shall govern the conflicting Bylaw provision.

59.     Limitations. This Agreement concerns the terms, conditions and expectations of the parties between themselves as Stockholders of the Corporation. Nothing contained herein shall be deemed to modify any existing agreements of the Corporation with third persons.

60.     Gender. Wherever the context shall so require, all words herein in any gender shall be deemed to include the masculine, feminine or neuter gender; all singular words shall include the plural and all plural shall include the singular.

61.     Headings. The headings used in this Agreement are used for reference purposes

23

only and are not to be deemed controlling with respect to the contents thereof.

62. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original.

63. <u>Attorneys' Fees and Costs</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, expenses, costs of appeal and necessary disbursements, in addition to any other relief to which such prevailing party may be entitled.

64. <u>Termination</u>. This Agreement shall terminate upon the occurrence of any of the following events:

64.1 Cessation of the Corporation's business;

64.2 Bankruptcy, receivership, or dissolution of the Corporation;

64.3 Whenever there is only one surviving Stockholder bound by the terms hereof;

64.4 The voluntary agreement of all parties who are then bound by the terms hereof.

Upon termination of this Agreement, each Stockholder shall surrender to the Corporation the certificates for his shares and the Corporation shall issue to him in lieu thereof, new certificates for an equal number of shares without the endorsement as set forth in Paragraph 48 of this Agreement.

65. <u>Waiver of Conflict</u>. The Stockholders hereby acknowledge that Greenspoon Marder, P.A. has represented the Corporation and may hereafter represent the Corporation. In the event of any dispute between the Stockholders, Greenspoon Marder, P.A. shall have the right to represent the Corporation in any such dispute. The Stockholders further acknowledge that Laurence I. Blair of Greenspoon Marder, P.A. has represented and will continue to represent Jonathan Fedele, Kyle Miko and their families and any other Stockholders with regard to their respective estate plans and all Stockholders waive any potential conflict of interest.

In witness whereof, the parties hereto have executed this Agreement on the day and year first above written.

Jonathan Fedele

Steven Lica

Kyle Miko

Virtuox, Inc.

By: _____
Steven Lica, President

24

only and are not to be deemed controlling with respect to the contents thereof.

62. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original.

63. <u>Attorneys' Fees and Costs</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, expenses, costs of appeal and necessary disbursements, in addition to any other relief to which such prevailing party may be entitled.

64. <u>Termination</u>. This Agreement shall terminate upon the occurrence of any of the following events:

64.1    Cessation of the Corporation's business;

64.2    Bankruptcy, receivership, or dissolution of the Corporation;

64.3    Whenever there is only one surviving Stockholder bound by the terms hereof;

64.4    The voluntary agreement of all parties who are then bound by the terms hereof.

Upon termination of this Agreement, each Stockholder shall surrender to the Corporation the certificates for his shares and the Corporation shall issue to him in lieu thereof, new certificates for an equal number of shares without the endorsement as set forth in Paragraph 48 of this Agreement.

65. <u>Waiver of Conflict</u>. The Stockholders hereby acknowledge that Greenspoon Marder, P.A. has represented the Corporation and may hereafter represent the Corporation. In the event of any dispute between the Stockholders, Greenspoon Marder, P.A. shall have the right to represent the Corporation in any such dispute. The Stockholders further acknowledge that Laurence I. Blair of Greenspoon Marder, P.A. has represented and will continue to represent Jonathan Fedele, Kyle Miko and their families and any other Stockholders with regard to their respective estate plans and all Stockholders waive any potential conflict of interest.

In witness whereof, the parties hereto have executed this Agreement on the day and year first above written.

Jonathan Fedele

Steven Lica

Kyle Miko

Virtuox, Inc.

By: _____
          Steven Lica, President

24

## ACCEPTANCE OF TRUSTEE

The undersigned hereby executes this Agreement to accept the office of trustee of the Insurance Trust created pursuant to the provisions of Paragraph 29 as of the day and year first written above.

_____
Lori Shrego

_____
Joseph Mott, CPA, as Trustee

25

## EXHIBIT "A"

For the Fiscal Year beginning on _____ the price per share for the stock of the Corporation is hereby stipulated to be $_____. Any promissory note which may be issued to a Selling Stockholder shall bear interest at the rate of ____% per annum.

In witness whereof, the parties hereto have signed this Exhibit "A" this _____ day of _____, 20____.


_____
Jonathan Fedele


_____
Steven Lica


_____
Kyle Miko

26

## EXHIBIT "B"

### INSURANCE

| Insured | Type of Policy | Amount of Policy | Issuing Company |
|---------|---------------|------------------|-----------------|